68 P.(2d) 168

CURRY et ux. v. JOURNAL PUB. CO. et al.

No. 4173.

Supreme Court of New Mexico.

May 3, 1937.

J. H. Paxton, of Las Cruces, for appellants.

Mechem & Hannett, of Albuquerque, for appellees.

BRICE, Justice.

This is an action on the case. The substance of the material facts alleged in the complaint are as follows:

The defendants (appellees here), in the year of 1932, published the Albuquerque Journal, a daily newspaper, circulating generally in New Mexico. On the 12th day of April, 1932, they published in that newspaper as a news item the following words:

"Hillsboro, N. M., April 11, (AP)— George Curry, 70, former territorial governor of New Mexico, Spanish-American war veteran and ex-congressman, died here Sunday afternoon."

The published statement was false. George Curry was not dead, but was alive and in good health at the time. The George Curry mentioned in said article was and is the father of the plaintiff, Clifford Curry, who read said published statement regarding his father, with the result that he suffered great pain and anguish, and which caused a nervous shock, resulting in a heart attack. His health is permanently impaired to the extent that he is unable to perform labor, all brought about by his reading the false published statement. The plaintiff Angelita Curry is the wife of plaintiff Clifford Curry. She also suffered a physical shock and prostration from reading the article, resulting in the permanent impairment of her health, by reason of which she cannot perform physical labor, is unable to bear children, and has suffered great pain and anguish. She was pregnant at the time she read such article, and the child, born the following June, was so permanently injured by reason of the shock to its mother that through life it will be sick, decrepit, timid, hysterical, and suffering. Specific items of expense incurred, such as physician's bills, loss of time, trips, etc., are set out. Total damages were claimed in the sum of $13,-592.

The parties will be styled plaintiffs and defendants, as in the district court.

The defendants demurred separately to the complaint upon the ground that it stated no cause of action; and the demurrers were sustained by the court. Plaintiffs refusing to amend, the suit was dismissed, and appeal to this court allowed and perfected.

No objection was made to the complaint because of misjoinder of causes of actions; nor for failure to separately state causes of action; nor because the defendants were not specifically charged with negligence. The appellees content themselves with raising the vital questions that determine the case; two of which are decisive: (1) Are damages that result from words

negligently spoken or written, as distinguished from acts, actionable? and, if so, then, (2) Can damages be recovered from the publishers of a newspaper for the consequences of grief resulting in physical injury, occasioned by reading in such paper a negligently published false report of the death of the reader's parent?

We have found no precedent in the books for this suit, and only two cases that are similar. This is conceded by appellant, but he asserts that, though this be true, such absence of precedent is not conclusive that the right claimed does not exist. To this we readily agree (Pavesich v. New England Life Insurance Co., 122 Ga. 190, 50 S.E. 68, 69 L.R.A. 101, 106 Am. St.Rep. 104, 2 Ann.Cas. 561); but it suggests that the existence of such right is not probable, in view of the fact that thousands of similar negligent acts must have occurred in the business of publication of news in this country, and Great Britain and its dependencies, causing grief and worry; though the disastrous consequences here charged (and which we must accept as true) are not, in human experience, usual or probable.

We have stated there are two similar cases. We first make reference to Jaillet v. Cashman, 115 Misc. 383, 189 N.Y.S. 743, 744. The facts as stated in the opinion are as follows:

"The defendant is the treasurer of Dow, Jones & Co., an unincorporated association engaged in the business of supplying its subscribers with items of current news by what is known as a ticker service. On March 8, 1920, it incorrectly reported the effect of a decision of the United States Supreme Court on the taxable status of stock dividends as income. Plaintiff saw the report on a ticker in his broker's office, and, believing that prices were going down, he sold stocks instead of holding or buying. That was unprofitable because the market rose on receipt of a correct report of the decision, and the plaintiff figures out a loss that he claims is attributable to the incorrect report that he read."

From these facts, the court concluded:

"I think that the relation of the defendant association to the public is the same as that of a publisher of a newspaper, and that its duties and obligations are to be measured by the same standard. A mistake in the report of a fact by one or the other is different in its effect only as to the number of people who may be misled and the extent to which individuals may be misled a matter of degree only.

"There is moral obligation upon every one to say nothing that is not true, but the law does not attempt to impose liability for a violation of that duty unless it constitutes a breach of contract obligation or trust, or amounts to a deceit, libel, or slander. Theoretically a different rule might be logically adopted, but as a matter of practical expediency such a doctrine seems absolutely necessary. There is no privity between this plaintiff and the defendant. He is but one of a public to whom all news is liable to be disseminated. His action can

be sustained only in case there was a liability by the defendant to every member of the community who was misled by the incorrect report. There was no contract or fiduciary relationship between the parties and it is not claimed that the mistake in the report was intentional. The demurrer to the complaint is sustained, and judgment awarded dismissing the complaint, with $10 costs and costs of the action."

The case was affirmed by the Appellate Division (202 App.Div. 805, 194 N.Y.S. 947) without an opinion; and upon appeal to the Court of Appeals the judgment of the Appellate Division was affirmed by memorandum opinion (235 N.Y. 511, 139 N.E. 714) with the following statement:

"The plaintiff, a customer in a broker's office having ticker service, believing that this report would depress the value of securities, sold some of his own stock and sold 'short' other stock which he did not own; that as a matter of fact the Supreme Court had decided that stock dividends were not taxable, and the defendant corrected its false report 45 minutes after it had been issued; that before this correction the stock market had reacted, and the appellant suffered damages. The Special Term held that the relation of defendant to the public was the same as that of a publisher of a newspaper and that it was not liable to one with whom it had no contract or fiduciary relationship for an unintentional mistake in its report."

The New York courts evidently assumed that the legal principles supporting their conclusion that no such right existed, in the absence of a contract, fiduciary relationship, or intentional injury, were so well established that it was unnecessary to more than state the conclusion without giving reason or authority therefor. We might well follow this example; but appellant's exceptionally good presentation of their case, and apparent abiding faith that a cause of action had been stated, impels us to give our reasons for sustaining the judgment of the district court.

The other case referred to is Herrick v. Evening Express Publishing Co., 120 Me. 138, 113 A. 16, 17, 23 A.L.R. 358, the facts in which are quite similar to those in this case. The defendants in that case had published in their newspaper an account of the death of a boy then serving in the American Expeditionary Forces overseas, and in connection therewith a picture of another boy of the same name, who likewise was in the Army overseas. The mother of the boy whose picture was published saw it and read the article, from the shock of which she became seriously ill; and the suit for damages followed. In determining the case the court said:

"The question is therefore presented whether under such circumstances the plaintiff has any cause of action for her mental pain and anguish caused by the shock of the supposed death of her son and her sickness resulting therefrom. We think not.

"In case of injury to a child, the father may maintain an action based upon a loss of services, but generally a parent cannot recover damages for injury to parental

feelings. Wyman v. Leavitt, 71 Me. 227, 231, 36 Am.Rep. 303, note 306. There are exceptions to this rule, as in cases of seduction or forcible abduction, which are based upon loss of services, but also involve the element of intentional, wanton, and willful wrong."

The case, however, was decided mainly upon the proposition that, there being no physical injury from without, damages by reason of sickness from mental shock were outside the principle of compensation, following the rule in the leading case of Spade v. Lynn & B. R. Co., 168 Mass. 285, 47 N.E. 88, 38 L.R.A. 512, 60 Am.St.Rep. 393. We do not find it necessary to decide this question, though the rule that such damages are recoverable is supported by high authority. Cooley on Torts (4th Ed.) § 48; Restatement of the Law of Torts, § 313. See annotations in 11 A.L.R. 1119, 40 A.L.R. 983, and 76 A.L.R. 681, where the cases pro and con are collected.

The only two cases where similar facts have been before any court, so far as our search has disclosed, have been decided against the contentions of appellant.

It has been the general holding of the English courts that there is no such thing as liability for negligence by word as distinguished from act. These courts hold that a person is liable for a spoken or printed false statement not amounting to libel, only in case he willfully originates or circulates it, knowing it to be false and which is calculated to and does, as the proximate cause, injure another to his damage.

In Wilkinson v. Downton, 2 Q. B. 57, it was held that a defendant who, intending a practical joke, falsely reported to a woman that her husband had met with a serious accident whereby both his legs were broken, with the intent that she should believe such a statement and which she did believe to be true and from which she suffered a nervous shock that made her ill, was liable to her in damages.

The English cases are reviewed in Bielitski v. Obadiak, 15 Sask.Law Rep. 156, 65 D. L.R. 627, 23 A.L.R. 351, in which the question was whether one who originates and circulates a false report that a member of the community had hanged himself, which report was told to the mother of the supposed suicide, and who, believing the report to be true, suffered violent shock from the effects of which she became ill, is liable in damages for such injury.

The majority of the court held the defendant was liable, in damages, upon the theory that the injury was the proximate result of the willful false report originated and circulated by him with the intent that it should be communicated to her. One of the judges dissented because the report came to her indirectly, and (as he held) the act of the defendant could not have been the direct and proximate cause of the injury; but he stated: "If the illness of the plaintiff had been the result of nervous shock or sudden distress caused by a false statement made willfully to her by the defendant, he would have been answerable in damages for the consequences of his statement."

The Court of Appeals of New York, in International Products Company v. Erie Railroad Company, 244 N.Y. 331, 155 N.E. 662, 663, 56 A.L.R. 1377, on this subject, states:

"We come to the vexed question of liability for negligent language. In England the rule is fixed. 'Generally speaking, there is no such thing as liability for negligence in word as distinguished from act.' Pollock on Torts (12th Ed.) p. 565; Fish v. Kelly, 17 C.B.(N.S.) 194. Dicta to the contrary may be found in earlier cases. Burrowes v. Lock, 10 Ves. 471; Slim v. Croucher, 1 De Gex, F. & J. 518, discussed in Brownlie v. Campbell, L.R. 5 App.Cas. 925, 935. But since Derry v. Peek, L.R. 14 App.Cas. 337, although what was said was not necessary to the decision, the law is clearly to the effect 'that no cause of action is maintainable for a mere statement, although untrue, and although acted upon to the damage of the person to whom the statement is made, unless the statement be false to the knowledge of the person making it' (Dickson v. Reuter's Telegraph Co., Limited, L.R.(1877) 3 Com.Pl. 1), or, as said elsewhere, 'we have to take it as settled that there is no general duty to use any care whatever in making statements in the way of business or otherwise, on which other persons are likely to act' (9 Law Quarterly Review, 292). And the same principle has been applied in equity (Low v. Bouverie, L.R.(1891) 3 Ch. 82) although it had been supposed that here, at least, there was often a remedy for negligent misrepresentation."

But the right to recover damages occasioned by false words negligently spoken or written has been upheld under some circumstances by American courts and approved by high authority.

"The question has sometimes been presented to the courts, whether aside from any question of fraud or of breach of a contractual obligation, an action may be successfully brought based upon negligence in the making of representations of fact. In England, the rule has been established that 'generally speaking, there is no such thing as liability for negligence in word as distinguished from act.' In a few recent cases in this country, however, the courts have tended towards, and finally adopted, the more logical position that circumstances which impose an obligation on the part of one to another to use care in his acts, would impose the same obligation of care in the making of statements of fact upon which such other might rely." 3 Cooley on Torts (4th Ed.) § 497.

"If the actor unintentionally causes emotional distress to another, he is liable to the other for illness or bodily harm of which the distress is a legal cause if the actor

"(a). should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

"(b). from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily

harm." Restatement of the Law of Torts, § 313.

Also see 45 C.J., Title, Negligence, § 125.

A leading case on the subject in America is International Products Company v. Erie R. Co., 244 N.Y. 331, 155 N.E. 662, 663, 56 A.L.R. 1377. The facts were that the defendant had contracted with the plaintiff to store an ocean shipment on arrival at the defendant's docks. The plaintiff asked the defendant the location of such shipment for the purpose of taking out fire insurance thereon. A wrong description was given as to the dock in which the property was stored, and the policy of insurance written, as though stored therein. The property was destroyed by fire in another warehouse. It was held, in a suit to recover the amount of insurance plaintiff would have been entitled to had defendant given it the correct description so that the policy would have been valid, that the defendant was liable for the amount of such insurance because of its negligence.

The court then stated the rule in England, which we have quoted, and further with reference to the liability of one who has given false information upon which another has acted to his injury, as follows:

"The denial, under all circumstances, of relief because of the negligently spoken or written word, is, it is said, a refusal to enforce what conscience, fair dealing, and the usages of business require. The tendency of the American courts has been towards a more liberal conclusion. * * *

"In New York we are already committed to the American as distinguished from the English rule. In some cases a negligent statement may be the basis for a recovery of damages. * * *

"Liability in such cases arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. Jaillet v. Cashman, 235 N.Y. 511, 139 N.E. 714. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another. Even here the inquiry must be made as the basis of independent action. We do not touch the doctrine of caveat emptor. But in a proper case we hold that words negligently spoken may justify the recovery of the proximate damages caused by faith in their accuracy.

"When such a relationship as we have referred to exists may not be precisely defined. All that may be stated is the general rule. In view of the complexity of modern

business, each case must be decided on the peculiar facts presented."

This rule has been applied to trustees who, through negligence, falsely certified the amount of security supporting corporate bonds, Doyle v. Chatham, etc., Bank, 253 N.Y. 369, 171 N.E. 574, 71 A.L.R. 1405; to a carrier or other bailee who gave false information to a customer as to the time, or place of arrival, or storage of goods, annotation, 56 A.L.R. 1382; to a public weigher who, knowing that a buyer would rely on his certificate of weights in making payment for goods, falsely certified such weights, Glanzer v. Shepard, 233 N. Y. 236, 135 N.E. 275, 23 A.L.R. 1425, and note; to a contractor blasting an obstruction off a railroad track, who assured an employee of the railroad company that there was no danger from blasts he was exploding, and who was injured by acting on such assurance, Valz v. Goodykoontz, 112 Va. 853, 72 S.E. 730; to a searcher of records of title, employed by a landowner, who delivered his abstract to a purchaser, who, on the faith of it, purchased the property, where there was privity between the abstractor and purchaser, Dickle v. Nashville Abstract Co., 89 Tenn. 431, 14 S.W. 896, 24 Am.St.Rep. 616; to a physician who assured a wife that she might safely treat an infected wound of her husband when such treatment resulted in damages, Edwards v. Lamb, 69 N.H. 599, 45 A. 480, 50 L.R.A. 160; Harriott v. Plimpton, 166 Mass. 585, 44 N.E. 992; to a telegraph company which falsely stated that a telegram had been delivered, Laudie v. Western Union Co., 126 N.C. 431, 35 S.E. 810, 78 Am.St.Rep. 668.

The rule is thus stated in Courteen Seed Co. v. Hong Kong, etc., Corporation, 245 N.Y. 377, 157 N.E. 272, 273, 56 A.L.R. 1186: "The court has had to deal recently with cases involving liability for information negligently given. They all rest on the principle that negligent words are not actionable unless they are uttered directly, with knowledge or notice that they will be acted on, to one to whom the speaker is bound by some relation of duty, arising out of public calling, contract or otherwise, to act with care if he acts at all." Also see 45 C.J., Title, "Negligence," § 125, p. 732.

No attempt has been made by any American court (International Products Co. v. Erie R. Co., supra), nor will be by us, to state rules which will apply generally to all conditions or circumstances, which will authorize a recovery for damages resulting from false words negligently written, or spoken, and in the absence of contract, malice, intentional injury, or other like circumstance. We hold that in some such cases recovery may be had, but we will confine our decision to the facts of this particular case.

Generally, though not without dissent (Hambrook v. Stokes Bros., [1925] L. K.B.[Eng.] 141; Bowman v. Williams, 164 Md. 397, 165 A. 182), recovery for the physical consequences of fright at another's peril, caused by the negligence of a third person, has been denied; not only by the courts which hold that a physical impact is necessary to such recovery, but by

those courts which hold that it is not. The Wisconsin courts hold to the doctrine that recovery may in a proper case be had solely for the physical consequences of fright, without physical injury from impact, Pankopf v. Hinckley, 141 Wis. 146, 123 N.W. 625, 24 L.R.A.(N.S.) 1159; but also hold that recovery cannot be had for the consequences of physical shock caused by fright at the peril of another, resulting from the negligence of a third person, Waube v. Warrington, 216 Wis. 603, 258 N.W. 497, 98 A.L.R. 394. The authorities generally are reviewed, and the court concludes that one who sustains the shock of witnessing the negligent killing of her child cannot recover for physical injuries caused by such fright or shock. The action was by the husband to recover because of his wife's death from the shock; but the case depended upon whether she could have recovered for the injury had she lived. The Wisconsin court stated:

"The problem must be approached at the outset from the viewpoint of the duty of defendant and the right of plaintiff, and not from the viewpoint of proximate cause. The right of the mother to recover must be based, first, upon the establishment of a duty on the part of defendant so to conduct herself with respect to the child as not to subject the mother to an unreasonable risk of shock or fright, and, second, upon the recognition of a legally protected right or interest on the part of the mother to be free from shock or fright occasioned by the peril of her child. It is not enough to find a breach of duty to the child, follow the consequences of such breach as far as the law of proximate cause will permit them to go, and then sustain a recovery for the mother if a physical injury to her by reason of shock or fright is held not too remote."

The court then quotes from the opinion of Judge Cardozo in Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253, as follows: " 'Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. * * * The plaintiff sues in her own right for a wrong personal to her, and not as the vicarious beneficiary of a breach of duty to another. * * * The passenger far away, if the victim of a wrong at all, has a cause of action, not derivative, but original and primary. His claim to be protected against invasion of his bodily security is neither greater nor less because the act resulting in the invasion is a wrong to another far removed.' "

The Wisconsin court summed up as follows: "In jurisdictions following the liberal rule it has been held consistently, with but two exceptions, hereafter to be noted, that in order to give rise to a right of action grounded on negligent conduct, the emotional distress or shock must be occasioned by fear of personal injury to the person sustaining the shock, and not fear of injury to his property or to the person of another"; and finally quoted from Judge Cardozo's opinion in the Palsgraf Case, supra, as follows: " 'Negligence is not a tort unless it results in the commission

of a wrong, and the commission of a wrong imports the violation of a right, in this case, we are told, the right to be protected against interference with one's bodily security. But bodily security is protected, not against all forms of interference or aggression, but only against some. One who seeks redress at law does not make out a cause of action by showing without more that there has been damage to his person. If the harm was not willful, he must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it though the harm was unintended. Affront to personality is still the keynote of the wrong.' "

■ The same rule should apply to this case. The wrong, if any, was done to Governor Curry, not his relations or friends. That emotional distress may follow from acts of negligence it is quite apparent; but no more than to a mother who witnesses the negligent killing of her child, in which case the consequential damages cannot be recovered. Waube v. Warrington et al., supra. Not every negligent act that results in damage to some one is actionable. Palsgraf v. Long Island R. Co., supra. There must be a duty owing to the injured by the person whose negligent act inflicts the injury, and such duty does not extend to the protection of third persons not directly involved except under special circumstances not appearing in the facts alleged by plaintiffs. Cooley on Torts (4th Ed.) § 478. Restatement of the Law of Torts, §§ 313, supra, and 436.

Another consideration would preclude a recovery in this case. We must assume that plaintiffs were free of the physical infirmities alleged to have resulted from shock and grief on reading the account of Governor Curry's death. In this world of disease and death the families of aged persons, while never entirely prepared, yet may not be greatly surprised to hear of their death at any time; and such serious consequences to the plaintiffs, and particularly to Mrs. Curry (a daughter-in-law of Governor Curry), are so unusual and unlikely to happen under any circumstances, and certainly not to persons in good health (and nothing appears to the contrary), that it cannot be said there was an appreciable chance of such results; and defendants, as reasonable men, could not have realized that there was an appreciable risk to the health of plaintiffs from reading the article, though they had known of plaintiffs' existence, which does not appear.

■ "If the actor intentionally and unreasonably subjects another to emotional distress which he should recognize as likely to result in illness or other bodily harm, he is subject to liability to the other for an illness or other bodily harm of which the distress is a legal cause,

"(a) although the actor has no intention of inflicting such harm, and

"(b) irrespective of whether the act is directed against the other or a third person.

The following are comments on this text:

"(e) On the other hand, an act, which is merely negligent as threatening an immediate harm to a third person, is not negligent to another solely because of the possibility that the peril or harm of such a person may indirectly cause fear, grief or similar emotional disturbance to others because of their interest in and affection for the third person and the possibility that they may be in such a physical condition that the emotional disturbance ·may be physically harmful. This is so irrespective of whether the other witnessed the third person's peril or harm or is informed of it immediately thereafter or at some subsequent period, and irrespective of whether they are or are not members of the same immediate family."

"Illustration:

"3. A negligently inflicts harm upon B so severe as to threaten his death. C, a bystander, who knows B, calls B's wife, D, on the telephone and tells her of the injuries which her husband has sustained. The resulting shock causes D to miscarry. A is not liable for D's miscarriage." Restatement of the Law of Torts, § 312 and comments.

In line with Waube v. Warrington, supra, see: Feneff v. New York Cent., etc., R. Co., 203 Mass. 278, 89 N.E. 436, 24 L.R.A.(N.S.) 1024, 133 Am.St.Rep. 291; Michigan Sanitarium, etc., Ass'n v. Neal, 194 N.C. 401, 139 S.E. 841; Chrone v. Gonzales (Tex.Civ.App.) 215 S.W. 368; Sherwood v. Ticheli, 9 La.App. 507, 120 So. 109; Kalleg v. Fassio et al., 125 Cal.App. 96, 13 P.(2d) 763; Nuckles v. Tennessee Elec.

Power Co., 155 Tenn. 611, 299 S.W. 775; Malone v. Monongahela, etc., Co., 104 W. Va. 417, 140 S.E. 340; Raymond & Whitcomb Co. v. Ebsary (C.C.A.) 9 F.(2d) 889.

There can be no difference in legal effect between the negligence which occasions a false writing and that of false spoken words. If one is actionable, then under the same state of facts the other will be.

■ Much has been said in the briefs regarding the freedom of the press. The First Amendment to the Constitution of the United States· provides that Congress shall make no law abridging the freedom of speech or of the press; the effect of which was to prevent Congress from interfering with such rights as they existed at the time of the adoption of this amendment. Similar provisions are a part of the constitution of each of the forty-eight states. See section 17 of article 2 of the New Mexico Constitution.

"The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please,· and to be protected against any responsibility for so doing, except so far as such publications, from their blasphemy, obscenity, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals. Or, to state the same thing in somewhat different words, we understand liberty of speech and of the press to imply not only liberty to publish, but complete immunity from legal

censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards we must look to the common-law rules which were in force when the constitutional guaranties were established, and in reference to which they have been adopted." Cooley on Constitutional Limitations (8th Ed.) p. 886.

■ A publisher of a newspaper has the same rights, no more or less, than individuals, to speak, write, or publish his views and sentiments, and is subject to the same restrictions. State ex. inf. Crow v. Shepherd, 177 Mo. 205, 208, 76 S.W. 79, 99 Am. St.Rep. 624. Appellees cite the case of Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 86 A.L.R. 466, to the effect that newspapers are not subject to the same strict duty with respect to press dispatches which they reproduce from gatherers of news as of that which the publisher holds himself or his agent out as the author and composer. This is thought to be against the weight of authority. Hotchkiss v. Oliphant, 2 Hill (N.Y.) 510. See annotation to Layne v. Tribune Co., 86 A.L.R. 475.

"The newspaper is also one of the chief means for the education of the people. The highest and the lowest in the scale of intelligence resort to its columns for information; it is read by those who read nothing else, and the best minds of the age make it the medium of communication with each other on the highest and most abstruse subjects. Upon politics it may be said to be the chief educator of the people; its influence is potent in every legislative body; it gives tone and direction to public sentiment on each important subject as it arises; and no administration in any free country ventures to overlook or disregard an element so pervading in its influence, and withal so powerful.

"And yet it may be doubted if the newspaper, as such, has ever influenced at all the current of the common law, in any particular important to the protection of the publishers. The railway has become the successor of the king's highway, and the plastic rules of the common law have accommodated themselves to the new condition of things; but the changes accomplished by the public press seem to have passed unnoticed in the law, and, save only where modifications have been made by constitution or statute, the publisher of the daily paper occupies to-day the position in the courts that the village gossip and retailer of scandal occupied two hundred years ago, with no more privilege and no more protection. * * *

"But a very large proportion of what the newspapers spread before the public relates to matters of public concern, in which, nevertheless, individuals figure, and must therefore be mentioned in any account or discussion. To a great extent, also, the information comes from abroad; the publisher can have no knowledge concerning it, and no inquiries which he could make would be likely to give him more definite information, unless he delays the publication until it ceases to be of value to his readers. Whatever view the law,

may take, the public sentiment does not brand the publisher of a newspaper as libeler, conspirator, or villain, because the telegraph dispatches transmitted to him from all parts of the world, without any knowledge on his part concerning the facts, are published in his paper, in reliance upon the prudence, care, and honesty of those who have charge of the lines of communication, and whose interest it is to be vigilant and truthful. The public demand and expect accounts of every important meeting, of every important trial, and of all the events which have a bearing upon trade and business, or upon political affairs. It is impossible that these shall be given in all cases without matters being mentioned derogatory to individuals; and if the question were a new one in the law, it might be worthy of inquiry whether some line of distinction could not be drawn which would protect the publisher when giving in good faith such items of news as would be proper, if true, to spread before the public, and which he gives in the regular course of his employment, in pursuance of a public demand, and without any negligence, as they come to him from the usual and legitimate sources, which he has reason to rely upon; at the same time leaving him liable when he makes his columns the vehicle of private gossip, detraction, and malice." Cooley on Constitutional Limitations (8th Ed.) c. XII.

The common law (and as we have seen, the English law of today) does not recognize, as actionable, injuries resulting from negligently spoken or written words. To what extent, if any, the liberty of the press and speech as we understand it, is involved, we need not decide. An American doctrine has grown up in recent years holding that in certain instances such negligence is actionable, but this case does not come within any rule or decision on the question.

We hold that damages cannot be recovered from the publishers of a newspaper for the consequences of grief resulting in physical injury, occasioned by reading in such paper a negligently published false report of the death of the reader's parent.

The judgment of the district court is affirmed and the cause remanded.

It is so ordered.

HUDSPETH, C. J., and SADLER and ZINN, JJ., concur.

BICKLEY, J., did not participate.