DE BARDELEBEN MARINE CORP., As Successor in Interest to Blue Stack Towing Company, et al., Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 29360.

United States Court of Appeals, Fifth Circuit.

Sept. 8, 1971.

John L. Briggs, U. S. Atty., Tampa, Fla., Michael Marks Cohen, Morton Hollander, Daniel Joseph, U. S. Dept. of Justice, Washington, D. C., William D. Ruckelshaus, Asst. Atty. Gen., for defendant-appellant.

Brendan P. O'Sullivan, Tampa, Fla., Fowler, White, Gillen, Humkey & Kinney, P. A., Tampa, Fla., of counsel, for plaintiffs-appellees.

Before JOHN R. BROWN, Chief Judge, TUTTLE and GODBOLD, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case is a novelty. It presents for our consideration such seemingly disparate questions as (i) the overlap of the Federal Tort Claims Act (FTCA) and the Suits in Admiralty Act (SIA) and (ii) the duty of the United States as cartographer. The Government presents an impressive array of theories which would preclude it from any liability. Though we reject practically all of them, we nonetheless reverse and hold that the Government should escape unscathed.

*In the Beginning*

In early 1964, Blue Stack Towing Company [1] was in the business of providing tug services in the Tampa Bay area. It owned the tugboat ABBIE-R which on February 8, 1964 was put under the command of Captain K. J. Damewood, a master mariner as well as a licensed Tampa pilot. On February 8, 1964 Coyle Lines, the chartered owner of Blue Stack barges 86 and 93, directed Captain Damewood to remove the phosphate-laden barges and to anchor them off Port Tampa dock. Accordingly, ABBIE-R towed the barges and anchored them side by side using each barge's own anchor.

ABBIE-R then returned for the night to its dock in Tampa Terminal. The next day, February 9, ABBIE-R was directed to pick up the barges. In attempting to weigh anchor the captain was informed that the anchor of one of the barges had fouled some submerged object. An attempt to free the anchor ruptured what turned out to be a $4\frac{1}{2}$ inch natural gas pipeline that had been laid in 1962 pursuant to a permit from the Corps of Engineers. A fire and explosion followed, causing damage to ABBIE-R, both barges and personal injuries to the tug's mate.

Dates now become important. The presence of the pipeline was first brought to the attention of seafarers in the Weekly Notice to Mariners No. 11 of March 16, 1963.[2] And its location was clearly marked on the next revision of Coast and Geodetic Survey Chart No. 587 issued as the 14th edition on September 16, 1963.[3] This was announced in Weekly Notice No. 42 of October 19, 1963.

But unfortunately neither of these revised charts was aboard ABBIE-R. What was aboard was the 13th edition of C. and G. Chart No. 587 (December 17, 1962) which admittedly did not reflect

1. De Bardeleben Marine Corporation subsequently became a successor in interest to Blue Stack.

2. These notices are issued in accordance with 33 CFR 72.01–1, 72.01–5:

"Through the means of Notices to Mariners, the Coast Guard disseminates information concerning establishments, changes, discontinuances, and certain deficiencies in operation of aids to navigation maintained by and under the authority of the Commandant."

"Local Notices to Mariners are issued by each District Commander. They include changes and deficiencies in aids to navigation maintained by and under the authority of the Commandant within the area of each Coast Guard District. These notices are published as often as required. If only local information is required, the notices issued by the various District Commanders will serve the needs of local navigators. They may be obtained, free of charge, by making application to the appropriate District Commander."

The Notices indicate among other things new hazards and changes in the charts issued by the Coast and Geodetic Survey pursuant to 33 U.S.C.A. §§ 883a–883d. These charts and Notices are the most widely used sources of detailed information regarding navigation conditions including hazards in the navigable waters of the United States.

3. It was also reflected on the 9th edition C. & G. Chart No. 1257, and announced in Weekly Notice No. 45, November 9, 1963.

the pipeline. And here the cause of this whole opinion is precipitated because this chart bore the authorized stamp "CORRECTED THROUGH NOTICE TO MARINERS No. 29, JUL 20, '63 U.S.C. & G.S. WASHINGTON, D. C." Had the corrections through Notice 29 (July 1963) been made, the pipeline announced in Notice No. 11 would have been reflected by hand corrections.[4] Each of Notices 42 and 45 warned that all previous editions of the particular chart, including the one aboard ABBIE-R, were obsolete and should no longer be relied upon.

The Government admitted that C. & G. Chart 587 with the false correction inscription was a misrepresentation. And therein lies the tale.

### The Court Acts

The Trial Court found both parties negligent[5] and apportioned the damages resulting from the pipeline explosion, the tugowner to bear 75% and the Government 25%. From this the Government alone has appealed, contending that (i) the claim is defeated by sovereign immunity, but if not then (ii) the Government's liability as a cartographer should be determined by a uniform federal (not the local Florida) rule, and (iii) such Federal rule should not impose liability for issuing a faulty chart. In addition it asserts (iv) contributory negligence for tugowner's use of an obsolete chart and (v) insufficient evidence to support the finding of reliance on the faulty chart. We reject (i), adopt (ii),

reject (iii) but do not get to (iv) and (v), since we hold that the Government's duty under the federal standard (iii) for a faulty chart terminates at the time a prudent shipowner reasonably would have learned of the true condition through the advices in a subsequent Weekly Notice to Mariners.

### Sovereign Immunity

It is often said that the doctrine of sovereign immunity is a derivative of the common law maxim "The King can do no wrong." But conceptually it is far older. Zeus himself carried an aegis or breastplate, a buckler, and a thunderbolt which made him, the mythological sovereign, immune from all that could beset him. And common law provided its sovereign with the immunity of Zeus. Yet Zeus saw fit to strip himself of this protection by giving it to Athena, whereas modern sovereigns have shown much reluctance to do likewise. Probably more accurately, the reluctance comes from the advocative arm of the Government contending for a restrictive reading of legislative amelioration.

The argument proceeds somewhat along this line. (i) The cause of action here is one of negligent misrepresentation. United States v. Neustadt, 1961, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614. (ii) Under the Federal Tort Claims Act (FTCA) such an action would be barred under the exception to the waiver of sovereign immunity in 28 U.S.C.A. § 2680(h).[6] (iii) The limitations of liability in the FTCA are to apply to ac-

---

4. Tugowner concedes that it had received the Notices for distribution to its tugs and that all tug masters had the responsibility to read the Notices, but the Court below found that Captain Damewood was *unaware of the contents of Notice No. 11* until after the fouling incident had occurred.

5. The original claim was grounded upon separate counts for negligence and breach of warranty. The District Court found it *necessary to decide only* the negligence claim. Since neither this ruling nor the 75/25% apportionment is questioned on appeal, we do not consider them.

6. "The provisions of this chapter and section 1346(b) of this title shall not apply to—

   \*     \*     \*     \*     \*

   "Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

   The general waiver of sovereign immunity reads as follows:

   "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a

tions brought under amendments to the Suits in Admiralty Act, 46 U.S.C.A. § 742. (iv) Thus, since this complaint would be barred under FTCA, it is likewise barred under the Suits in Admiralty Act.

Though we agree with the premise that the claim is one of negligent misrepresentation, we disagree with the conclusions that the Government would have us draw.

### Pre-1960 Suits in Admiralty Act

Before 1960, the Suits in Admiralty Act, enacted in 1920, permitted a suit against the Government in cases involving Government merchant vessels and Government cargoes "in cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained." Act of March 9, 1920, 41 Stat. 525, 46 U.S.C.A. § 742. The spur for this legislation was the Government's entry into the merchant shipping business with the advent of World War I. Congress felt that the liability of the Government should be coextensive with that of private shipowners and shippers who theretofore had been the primary participants in merchant shipping.[7] All suits under the 1920 SIA (as well as the Public Vessels Act) were under the exclusive jurisdiction of the United States District Courts.

### Confusion Compounds Complication

But a serious problem of jurisdiction arose because of the partial overlap of the SIA with the Tucker Act, 28 U.S.C.A. § 1346(a) (2), and the vexing problem of the "merchant" or "public" vessel status since SIA and PVA are mutually exclusive. The Tucker Act provided for concurrent jurisdiction of the District Court and the Court of Claims for contract (and quasi-contract) claims "not exceeding $10,000 in amount." But there was to be "exclusive jurisdiction in the Court of Claims for claims in excess of $10,000." S.Report No. 1894, 86 Cong.2d Sess.,[8] 1960 U.S.Code Congressional and Administrative News, pp. 3583, 3585.

If the claim was a "contract" claim and exceeded $10,000 the exclusive jurisdiction was in the Court of Claims. If, on the other hand, while apparently a contract claim it was not so in law, then exclusive jurisdiction was in the par-

---

private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof."
28 U.S.C.A. § 2674

"The district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
28 U.S.C.A. § 1346(b).

7. A counterpart for non-merchant vessels, such as naval craft, men of war, etc., was the Public Vessels Act, (PVA) 43 Stat. 112, 46 U.S.C.A. § 781, enacted 1925, which provided a like liability but with somewhat differing venue/jurisdiction provisions.

8. This is an exceptionally informative outline of the problem. The Congress was acting on the advice of experienced experts from the American Maritime Law Association, whose members daily suffered the agonies of confusion, and the Department of Commerce with its governmental connection with shipping problems.

ticular District Court(s) prescribed in SIA or PVA depending on whether the claim involved a merchant or public vessel (or government cargo). In claims admittedly "non-contract" great confusion existed in the "merchant" or "public" vessel conflict, especially because of PVA's venue provisions, which were actually jurisdictional.

Complicating all of this was the fact that the character of the claim—contract or non-contract—or the status of the vessel—merchant or public—was shrouded in the law's traditional unpredictability, or at least uncertainty. That meant that it was only when the last bell rang that the critical determination was made. That brought in the problem of statutes of limitations since under the Tucker Act it is six years, while under SIA and PVA it is two years. This uncertainty naturally led the Government's counsel to contend in each case that the claim or vessel was not as contended by libellant or claimant but was something else. This reflex built on the uncertainty which Government proctors could likewise legitimately hold, plus a hope that it would practically work to defeat the claim from passage of time, often led to inconsistent positions.[9]

In the face of this confusion even the most sea-sprayed proctor found these concepts as hard to clutch as Macbeth's dagger. Misfilings were not only common but often disastrous, with differences in the limitation period. And if a suit was filed in the wrong court it could not be transferred to the proper one. See, e. g., Senate Report, *supra* at pp. 3585–86. Like the land-locked lawyer of yesteryear who found his cause lost for failing to distinguish trover and replevin, the most skilled admiralty proctor often did not know when he opened the courthouse door whether the lady or the tiger would emerge,[10] or whether indeed, the courtroom was open at all. Cf. Lincoln Mills of Ala. v. Textile Workers Union, 5 Cir., 1956, 230 F.2d 81, 89 (Brown, J., dissenting).

### The 1960 Congressional Cure

In 1960 Congress set out to cure this masterpiece of confusion. By the 1960 Amendments Congress in the first two sections (Pub.L. 86–770, 74 Stat. 912)[11] modified the judicial code to permit transfer of cases from the Court of Claims to the District Court and vice versa if the case was filed in the wrong Court originally. But these provisions only prevented the "ultimate loss of rights of litigants, but * * * did nothing to eliminate or correct the cause of original erroneous choices of forum while [they] could increase the existing delays." Senate Report, *supra* at p.

9. There was in all of this another troublesome "gap"—in addition to the conflicts on venue, jurisdiction and limitations—for claims which were not contractual, (i. e. not arising from a merchant, public vessel or government cargo). If in tort, these were under FTCA (see note 6, *supra*). Although solution of this complication was not sought in the first drafts, on the suggestion of the Department of Commerce joined in by AMLA, this was taken care of by the phrase "or if a private person or property" in the 1960 Amendments (see note 12, *infra*).

10. And "almost as disturbing as the dismissals for want of 'jurisdiction' was the mass of litigation over whether a particular vessel was a 'public vessel' or was 'employed as a merchant vessel.' " Healy and Currie, Admiralty at 863 (1965 ed.).

11. "If a case within the exclusive jurisdiction of the Court of Claims is filed in a district court, the district court shall, if it be in the interest of justice, transfer such case to the Court of Claims, where the case shall proceed as if it had been filed in the Court of Claims on the date it was filed in the district court."
28 U.S.C.A. § 1406(c).

"If a case within the exclusive jurisdiction of the district courts is filed in the Court of Claims, the Court of Claims shall, if it be in the interest of justice, transfer such case to any district court in which it could have been brought at the time such case was filed, where the case shall proceed as if it had been filed in the district court on the date it was filed in the Court of Claims"
28 U.S.C.A. § 1506

3587. Thus a third section was added substantively to amend § 2 of the 1920 Suits in Admiralty Act.[12]

The Senate Report indicates that the purpose "of the amendments is to make as certain as possible that suits brought against the United States for damages caused by vessels and employees of the United States through breach of contract or tort can be originally filed in the correct court so as to proceed to trial promptly on their merits." And in another part of the Report we learn that the "purpose of the bill, as amended, is to authorize the transfer of cases between the U. S. district courts and the Court of Claims, and vice versa. "The bill also clarifies confusing language now existing in section 2 of the Suits in Admiralty Act." Senate Report, *supra,* at p. 3583.

### Let's Reinject Confusion

But despite these plainly described purposes including a substantial substantive broadening of the scope of the liability for maritime claims, the Government insists that with respect to claims not within the pre-1960 SIA or PVA,[13] Congress meant to import all of the exceptions of FTCA, and especially that against misrepresentation, § 2680(h) (note 6, *supra*). It urges that Congress was dealing with just the confusing conflicts. There is no mention in the Amendment or Report of an intention to further waive sovereign immunity, and it is impermissible for the Court to read in any such purpose.

### Restrictive Reading Rejected

We reject these contentions. The words of the statute, its legislative history, the liberal approach in interpreting waivers of immunity, and the senseless absurdities which would result belie the narrow reading that the Government would give to the new (1960) Section 2 of SIA. If one were bringing an action against a private cartographer for maritime injuries from the negligent publication of a marine chart, he could bring "a proceeding in admiralty," 46 U.S.C.A. § 742. And the case certainly satisfies the requirement that "if a private person * * * were involved," the claimant could proceed in admiralty and a private cartographer would at least be exposed to potential liability.

■ It is true that the legislative history says nothing concerning a purpose to surrender immunity. It is equally true, though, that § 742 by its own terms disavows governmental immunity in admiralty actions against the United States. Had the sole purpose of the legislation been to clarify the confusing language of the old SIA this would have been better done by modifying the old § 742 to contain a clear definition of merchant, public, vessels and cargoes plus a delineation of contract claims growing out of Governmental shipping operations.

More positively, the legislative history shows that almost on the eve of a probable enactment of a narrowly constructed solution to conflicts in jurisdiction between the Court of Claims and the District Courts, Congress on an articulate analysis by the Secretary of Commerce (see Senate Report, *supra* at p. 3589) set out to solve the underlying problems by eliminating the historic restriction of SIA–PVA liability to non-contractual claims relating to ships or cargo. It was to assimilate the Government to the private person in relation to any or all transactions giving rise to liability in the Admiralty. It would be incongruous to impute to Congress a purpose to perpetrate confusion, not by reason of choos-

---

12. "In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, *or if a private person or property were involved,* a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States or against any corporation mentioned in section 741 of this title. [46 U.S.C.A. § 741]" (emphasis added).
   46 U.S.C.A. § 742

13. I. e., not involving a merchant or public vessel or government cargo.

ing the wrong forum, but by importing substantive standards of liability and governmental defenses by a retrospective analysis of what would have been the case prior to 1960. Reimportation of FTCA provisions [14] or exceptions [15] produces obviously unintended and irrational distinctions.

Finally, any such reading is out of step [16] with that given to similar restrictive efforts in *Rayonier*, note 15, *supra*; United States v. Muniz, 1963, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805; Indian Towing Co. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48. No better way to end this discussion can be found than these words from *Rayonier, supra*. "There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it" (352 U.S. at 320, 77 S.Ct. 374), quoted in *Muniz, supra* (374 U.S. at 166, 83 S.Ct. at 1859).

The tide of history is running clearly against the concept of sovereign immunity. The disfavor into which the doctrine has fallen was observed as far back as Keifer & Keifer v. Reconstruction Finance Corporation, 1939, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784. In Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24, this Court pointed out that the assault upon the citadel of immunity continues presently

apace. Any doubts as to its waiver therefore are to be resolved against the sovereign. We had this to say:

"In the structure of the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., the Public Vessels Act, 46 U.S.C.A. § 781 et seq., and the Federal Tort Claims Act, 28 U.S.C.A. § 1346 (b) which expose the government in all of its sovereign glory to almost unlimited liabilities comparable to private parties, the approach is to construe the waiver sensibly, naturally, which means most of the time, literally. Although repeated expressions do not daunt the sovereign's representatives in dragging out the old markers of this ancient shibboleth, they are plain enough to read and heed. '[W]aivers by Congress of governmental immunity from suit should be liberally construed in the case of federal instrumentalities * * *.' R.F.C. v. J. G. Menihan Corp., 1941, 312 U.S. 81, 84, 61 S.Ct. 485, 487, 85 L.Ed. 595, 598. '[W]e think Congressional adoption of broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation.' Canadian Aviator, Ltd. v. United States, 1944, 324 U.S. 215, 222, 65 S.Ct. 639, 643, 89 L.Ed. 901, 907. There is to be no niggardly construction for 'when Congress authorized federal instrumentalities of the type here involved to "sue and be sued", it

14. If, as now urged, the non-ship-non-cargo claims are tried to FTCA, is the claimant bound by the requirements of submission to the agency responsible (see 28 U.S.C.A. § 2675)? If so, is the two-year limitation of SIA (46 U.S.C.A. § 745) tolled? Cf. Richardson v. United States, 9 Cir., 1971.

15. Consider, e. g., the discretionary function exception, 28 U.S.C.A. § 2680(a). See Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427; Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354. Nothing is more "discretionary" than the operation of a man of war in military or wartime operations, yet these are covered. See, e. g., Canadian Aviator, Ltd.

v. United States, 1944, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901, 1944 A.M.C. 1351; United States v. The Washington, 4 Cir., 1957, 241 F.2d 819, 1957 A.M.C. 201, cert. denied, 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34; United States v. S.S. Malden, E.D.Va., 1963, 224 F.Supp. 705, 1964 A.M.C. 1108, aff'd per curiam, 4 Cir., 1965, 341 F.2d 292; Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 1949, 175 F.2d 632, 1949 A.M.C. 1120; General Ins. Co. of America v. Link, 9 Cir., 1949, 173 F.2d 955, 1950 A.M.C. 377, cert. denied, 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532.

16. Amell v. United States, 1968, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 does not compel a different result.

used those words in their usual and ordinary sense.' F.H.A. v. Burr, 1940, 309 U.S. 242, 246, 60 S.Ct. 488, 491, 84 L.Ed. 724, 729. This is especially true of corporate instrumentalities. 'In spawning these corporations during the past two decades, Congress has uniformly included amendability to law. Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to-sue-and-be-sued was included.' It is 'Congress' * * * emphatic practice not to confer sovereign immunity upon these government corporations.' Keifer & Keifer v. R.F.C., 1938, 306 U.S. 381, 390, 393, 59 S.Ct. 516, 518, 520, 83 L.Ed. 784, 789, 791. And it is well summed up in *Menihan, supra.* 'In the Keifer case * * * recognizing that Congress may endow a governmental corporation with the government's immunity, we found the question to be "Has it done so?" That is, immunity in the case of a governmental agency is not presumed. We sought evidence that Congress had intended that its creature, considering the purpose and scope of its powers, should have the immunity which the sovereign itself enjoyed, and we noted the practice of Congress as an indication "of the present climate of opinion"

which had brought governmental immunity from suit into disfavor. Accordingly, being unable to find that Congress had intended immunity from suit we denied it.' 312 U.S. at 84, 61 S.Ct. at 486, 85 L.Ed. at 597."

### Whose Law Controls?

■ On the important question of the nature of the duty owed by the Government to those using C. & G. Charts we consider this to be a matter of federal law.[17] And finding no Congressional guidance on the subject "it is for the federal courts to fashion the governing rule of law according to their own standards." Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838, 841. The federal government has long virtually preempted the field of control of navigation including the promulgation of rules of the road and the publication of charts and notices to mariners. Conversely, the States[18] have had little, if anything to do with these matters.

As we have frequently done[19] we hold that the interests at stake clearly call for a uniform federal standard.

### Federal Law to Be State Law

Having urged as successfully to ordain federal substantive law the Govern-

---

17. In admiralty, maritime law maintains a paramount position by virtue of the Constitution. Yet state law has sometimes been used as a guide to substantive rights, even though it might logically seem that

"wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant. But the process is surely rather one of accommodation, entirely familiar in many areas overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern."

Kossick v. United Fruit Co., 1961, 365 U.S. 731, 739, 81 S.Ct. 886, 892, 6 L.Ed. 2d 56, 63.

18. A key example of the adoption of state law is Wilburn Boat Company v. Fireman's Fund Insurance Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337. The case dealt with warranties in marine insurance policies. The Supreme Court emphasized that Congress had never dealt with the problem and that the states have always exerted strong regulatory powers in the field.

19. See, e. g., Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, cert. dism'd, Fidelity & Cas. Co. v. Grigsby, 1970, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; Flowers v. Savannah Machine & Foundry Co., 5 Cir., 1962, 310 F.2d 135; Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 1961 A.M.C. 1651, cited with approval in Rodrigue v. Aetna Casualty & Surety Co., 1969, 395 U.S. 352, 363 n. 9, 89 S.Ct. 1835, 1841, 23 L.Ed.2d 360, 369 n. 9.

ment, quite legitimately, would have us turn to the common law for it. If a newspaper prints incorrect information, if a scientist publishes careless statements in a treatise, or if an oil company prints an inaccurate road map, they cannot be "liable" to those of the general public who read their works absent some special relationship between writer and reader. For this the Government cites a number of State cases,[20] and as though we did not have enough problems with our own jurisprudence it throws in a couple of English cases because one or more of the Judges referred to a cartographer's liability.[21] The special circumstances require a showing in varying degrees that (1) the information was specially communicated by the defendant to the plaintiff, (2) the defendant knew the specific purpose for which the plaintiff sought the information, and (3) the defendant intended to influence the plaintiff's conduct with regard to that purpose.

Alternatively the Government urges the *Ultramares*[22] rule that even if information is specially provided for Plaintiff, the furnisher will not be liable to third parties who come to rely upon it without the knowledge and consent of the defendant. Since there is no affirmative showing that the Government sold the chart directly to tugowner, the *Ultramares* rule would, the Government contends, make this lack of privity preclude liability.[23]

Whatever may be said for these legal principles we find them strikingly inappropriate here. First we may observe that the philosophical basis for these precepts is the "economic factor," Green, The Duty Issue In Tort Law, * * * Columbia Law Review, * * * 1928. That is, the usual publishers of newspapers, treatises, and maps lack the financial resources to compensate an indeterminate class who might read their work. Potential liability would have a staggering deterrent effect on potential purveyors of printed material. Although we are not suggesting that the purse of the Government is either unlimited or should be dissipated by largess at the hands of judicial opinions, this factor is of no significance here.

But we would approach this affirmatively to choose a legal standard in the light of actualities. These are not just casual publications which may be of interest to or fall into the hands of an indeterminate number of users. These charts are published by the Government with the certain knowledge that they (i) will be disseminated through reliable channels to ships and crews and (ii) will be relied on as accurate portrayals of the waters covered. Indeed, this expectation is mandated as a rule of prudent conduct on the part of shipowners. Sailing without a chart or with an obsolete one ranks as more than a mere indiscretion. Many Courts have found such ships to be unseaworthy.[24] Others have

20. The Government cites: MacKown v. Illinois Pub. & Printing Co., 289 Ill.App. 59, 6 N.E.2d 526 (1937) ; Jaillet v. Cashman, 235 N.Y. 511, 139 N.E. 714 (1923), aff'g mem. 202 App.Div. 805, 194 N.Y.S. 947 (1922), aff'g mem. 115 Misc. 383, 189 N.Y.S. 743 (Sup.Ct.1921) ; Curry v. Journal Pub. Co., 41 N.M. 318, 68 P.2d 168 (1937) ; Prosser on Torts 719–724 (3d ed. 1964) ; 1 Harper & James on Torts § 7.6 (1956); Winfield on Torts 563 (7th ed. Jolowicz & Lewis 1963).

21. Candler v. Crane, Christmas & Co., 1951, 2 K.B. 164 (C.A.), overruled on other grounds by Hedley, Byrne & Co. v. Heller & Partners, 1964, A.C. 465 (H.L.).

22. Ultramares Corporation v. Touche, 1931, 255 N.Y. 170, 174 N.E. 441.

23. We think it unimportant whether the District Court's finding that the chart was ·sold directly to tugowner is credited.

24. See The Maria, 4 Cir., 1937, 91 F.2d 819, 1937 A.M.C. 934; The W. W. Bruce, 2 Cir., 1938, 94 F.2d 834, 1938 A.M.C. 232, cert. denied, Pacific-Atlantic S.S. Co. v. Weyerhaeuser Timber Co., 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533; The Iowa, D.Ore., 1940, 34 F.Supp. 843, 1941 A.M.C. 111; Cf. Middleton & Co., Ltd. v. Ocean Dominion S.S. Corp., 2 Cir., 1943, 137 F.2d 619, 1943 A.M.C. 1043, cert. denied, 320 U.S. 802, 64 S.Ct. 432, 88 L.Ed. 484.

found mariners who follow such practice guilty of "glaring" or "gross" fault.[25]

What the maritime law exacts of shipowner through decisions of admiralty courts may hardly be ignored by the Executive Agency responsible for such charts. The Government must therefore bear the burden of using due care in the preparation and dissemination of such charts and notices.[26]

### How Long Does Duty Run?

But since the duty arises out of the statutory and traditional position of the role played by the Government in furnishing charts to mariners with the legal demand they be effectively available and used, the duty as thus framed should take into account the whole of this governmental process.

An important part of that process is the issuance of weekly notices announcing the issuance of new editions of the charts. As this record reflects without contradiction these are as much a part of the prudent navigator's safety tools as the availability and use of the charts. The Notices are a reliable way to inform mariners of changes *including* errors in previous advices or charts, whether the Government is or is not aware of the errors.

The consequence is that—as a part of the duty, not just a defense of contributory negligence—the Government's obligation ceases at that time in which a prudent shipowner-navigator would have reasonably received the Notice to Mariner advising of the publication of a revised chart correctly portraying the condition in question.

On that basis no duty was breached because Notices 42 and 45 of October and November 1963 announced the publication of new (and admittedly correct) charts which rendered Chart 587 on the tug obsolete.

So while the Government sustains not a single specific contention, it still wins.

Reversed.

25. Continental Oil Company v. M.S. Glenville, S.D.Tex., 1962, 210 F.Supp. 865, 1962 A.M.C. 2311; Placid Oil Company v. S.S. Willowpool, E.D.Tex., 1963, 214 F.Supp. 449, 1963 A.M.C. 635.

26. The "private person" factor is no obstacle to recovery. In SIA the test, unlike FTCA, is not *liability* of the private person, but whether the private person could in good faith *sue* (not necessarily recover) in admiralty. In any event *Rayonier, Indian Towing,* and *Muniz,*

*supra,* show the Government is not exonerated because private persons do not put out forest fires, mark wrecks or keep prisoners. See also United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, cert. denied, 1961, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365.