THE STATE v. VAN WYE, *Appellant.*

Division Two, December 1, 1896.

136  227;
157  317
136  227
164  531

1. Criminal Law: SCANDALOUS PUBLICATION: STATUTE: FREEDOM OF PRESS: CONSTITUTION. The act of the legislature of 1891 (Laws, p. 125), declaring guilty of a felony one who engages in the business of editing, publishing, or disseminating a paper devoted mainly to the publication of scandals, immoral conduct, etc., does not contravene section 14 of the Bill of Rights (Const., art. 2), prohibiting any law impairing the freedom of speech and providing that every person shall be free to say, write, or publish whatever he will, being responsible for all abuse of that privilege.

2. Criminal Practice: SPECIAL JUDGE: WAIVER OF OATH. A party to a suit may waive the taking of the oath by one selected as a special judge.

State v. Van Wye.

3. ———: DISSEMINATING SCANDALOUS NEWSPAPER: INDICTMENT: STAT-
UTE. An indictment, founded on the above act of the legislature,
which charges that on a certain day defendant engaged in the busi-
ness of disseminating and sold a certain paper known as "The Kansas
City Sun," which newspaper was devoted mainly to the publication of
scandals, assignations, etc., is sufficient without setting out the
contents of the paper, the date of the edition, to whom sold, and like
details.

4. ———: ———: COMPETENCY OF JUROR. A juror, who, on his *voir*
*dire*, stated that he entertained an opinion that "The Kansas City
Sun" ought to be suppressed, but that he had no opinion as to de-
fendant's guilt or innocence; that he had never read any of the con-
tents of the paper, and formed his opinion only from what he under-
stood was its general character, and could render an impartial ver-
dict, was competent.

5. ———: ———: CRUEL AND UNUSUAL PUNISHMENT: CONSTITUTION.
A sentence to the penitentiary for the term of two years for selling a
newspaper devoted mainly to the publication of scandals and
immoral conduct is not a cruel or unusual punishment within the
meaning of the constitution.

6. ———: INDICTMENT: TWO COUNTS: GENERAL VERDICT. Where two
counts of an indictment relate to one and the same transaction, a
general verdict is sufficient.

7. ———: VERDICT: ASSESSMENT OF PUNISHMENT BY THE COURT. A
verdict finding the defendant guilty of the offense charged, assessed
his punishment "at two (2) in the penitentiary." *Held*, that the
verdict was good as a general one of guilty, and that the trial court
was authorized to assess the punishment.

*Appeal from Buchanan Criminal Court.*—HON. A. M.
WOODSON, Judge.

AFFIRMED.

*Harry L. Strohm* for appellant.

(1) The court erred in overruling the objections
to the competency of the juror Campbell. The *voir
dire* examination clearly shows that he was under the
influence of impressions which would close his mind
to evidence. *State v. Cunningham*, 100 Mo. 382; *State
v. Brooks*, 92 Mo. 542; *McCarthy v. Railroad*, 92 Mo.

536.   (2) The indictment should set out the matter alleged to constitute the offense, or at least give facts sufficient to identify the newspaper, such as the place where published, the date, the number of the volume, and the edition.   The law of this state has uniformly held that these matters must be set out in the indictment, in order to comply with the constitutional requirement, section 22 of the bill of rights.   *State v. Hayward*, 83 Mo. 289;   *U. S. v. Harmon*, 34 Fed. Rep. 872;   *In re Swarts*, 47 Kan. 157;   *State v. Krueger*, 35 S. W. Rep. 604.   (3) A punishment may be denominated cruel and unusual when greatly in excess of that demanded as a preventive of the offense prohibited and when exceeding that usually prescribed for like offenses. Cooley's Const. Lim., chap. 10;   *State v. Williams*, 77 Mo. 310.   (4) The liberty of the press, as guaranteed by the constitution, means the licentiousness of the press, but it does give the right freely to publish whatever the citizen may please, and to be protected against any responsibility for so doing, except in so far as such publication, from its blasphemy, obscenity, or malicious falsehood, may be a public offense.   Cooley, Const. Lim., chap. 12;   Odgers on Libel, 10;   4 Blackstone, 152;   Newell on Defamation, 962.   (5) Liberty of the press consists of the right to publish, with immunity, the truth with good motives and for justifiable ends, whether it respects government or individuals.   *Gazette v. Timberlake*, 10 Ohio St. 548;   *People v. Crosswell*, 3 Johns. Cas. 393;   De Lolme, Const. 254;   2 Kent, Com. [12 Ed.] 17.   (6) So well is this principle recognized in this state that no writ will issue to enjoin the publication of a libel.   *Life Ass'n v. Boogher*, 3 Mo. App. 179.   (7) Both English and American commentators are agreed that the liberty of the press consists in this, that neither courts of justice, nor any other judges whatever, are authorized to take notice of writings

intended for the press, and any restriction to the free expression of opinion is violative of that guaranteed liberty. De Lolme, Const., 254; Cooley, Con. Lim., 420; 2 Kent [12 Ed.], 17; Rawle on Const., ch. 10. (8) Liberty of the press consists in printing, without any previous license, whatsoever one chooses. *Root v. King*, 1 Cow. 628; *Sweeney v. Baker*, 13 W. Va. 182. (9) Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press. 4 Black. Com. 152; *Rex v. Dean*, 3 T. R. 431; *Rex v. Cobbitt*, 39 How. St. Tr. 49; *Rex v. Cuthall*, 17 How. St. Tr. 675; *Louthan v. Com.*, 79 Va. 196.

*R. F. Walker*, attorney general, *Morton Jourdan*, assistant attorney general, and *A. B. Duncan*, prosecuting attorney, for the state.

(1) The indictment in this case is sufficient. The pleader closely followed the language of the statute creating the offense and has met all the requirements of the statute and constitution. Laws, 1891, p. 125; *Strohm v. People*, 43 N. E. Rep. 622. (2) The act under which the defendant has been indicted, tried, and convicted is constitutional and not in violation of that provision of the constitution guaranteeing freedom of speech or the right to say, write, or publish whatever he will on any subject. Sec. 4, art. 2, con.; *In re Banks*, 42 Pac. Rep. 693. (3) Whether the court committed error in the admission or exclusion of the testimony depends entirely upon the single question whether or not the indictment was sufficient and charged such facts as were necessary to constitute a violation of the statute. ·An examination of the rulings of the court will disclose the fact that no error was committed, but that the case was tried upon the

State v. Van Wye.

proper theory that if the defendant had sold or disseminated or distributed this immoral publication, then he was guilty of a violation of the statute and that only two facts were necessary to his conviction: *First*, that the newspaper introduced was an immoral publication such as came within the prohibition of the statute, and *second*, that this defendant distributed, disseminated, and sold the paper. These facts were shown beyond question; in fact, there was no denial of either proposition, and, therefore, the verdict should not be disturbed upon the grounds that the testimony was insufficient or that illegal, irrelevant, and immaterial testimony was admitted. The legislature of this state has placed its stamp of disapproval by the enactment of this statute upon this infamous and immoral system of blackmail. (4) The testimony in this case shows the guilt of the defendant tried upon an indictment which violated no constitutional right guaranteed him and the judgment should be affirmed.

GANTT, P. J.—The grand jury of Buchanan county preferred the following indictment against the defendant at the March term, 1896, of the criminal court of said county, the first count of which is as follows:

"The grand jurors of the state of Missouri, within and for the body of the county aforesaid, being duly impaneled and sworn, upon their oath do present that J. W. Van Wye, on the seventh day of March, 1896, at the county of Buchanan, and state aforesaid, unlawfully, willfully, and feloniously, did then and there engage in the business of disseminating a certain newspaper and printed paper commonly called and known as *The Kansas City Sunday Sun*, which newspaper and printed paper was then and there devoted mainly to the publication of scandals, whorings, lechery, assignation, intrigues between men and women, and immoral con-

duct of persons, against the peace and dignity of the state.''

The second count of the indictment is as follows: "2nd.   And the grand jurors aforesaid, on their oath aforesaid, do further say and present that the said J. W. Van Wye, on the seventh of March, 1896, at the county of Buchanan, and state aforesaid, did then and there unlawfully, willfully, feloniously, and knowingly have in his possession for sale, keep for sale, assist in the sale, expose for sale, gratuitously distribute and gave away a certain newspaper and printed paper commonly called and known as *The Kansas City Sunday Sun*, which said newspaper and printed paper was then and there devoted mainly to the publication of scandals, whoring, lechery, assignations, intrigues between men and women, and immoral conduct of persons, contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the state.''

A motion to quash was overruled and the defendant was arraigned, tried and convicted and sentenced to imprisonment in the penitentiary for two years.

This indictment was founded upon an act of the thirty-sixth general assembly (Laws of Missouri, 1891, p. 125), which is as follows:

"Section 1.   Every person or persons who shall, within this state, engage in the business of editing, publishing or disseminating any newspaper, pamphlet, magazine, or any printed paper, devoted mainly to the publication of scandals, whorings, lechery, assignations, intrigues between men and women, and immoral conduct of persons, or any person or persons who shall knowingly have in his or her possession for sale, or shall keep for sale, or expose for sale, or distribute, or in any way assist in the sale, or shall gratuitously distribute, or give away, any such newspaper, pamphlet, magazine

or printed paper in this state, shall be deemed guilty of a felony, and on conviction thereof, shall be punished by imprisonment in the penitentiary for a term of not less than two nor more than five years."

The defendant urges various grounds for reversal and they will be considered in the order of their importance.

I.    The constitutionality of the act of 1891, already quoted, is assailed because it is claimed to be in contravention of section 14 of the bill of rights of Missouri. That familiar section ordains that, "no law shall be passed impairing the freedom of speech; that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel the truth thereof may be given in evidence."

This court has heretofore often asserted its right and duty to determine whether a legislative enactment solemnly passed and promulgated according to the forms of our constitution was in fact and substance repugnant to the constitution, and if so to declare it void.    The exercise of this most important authority has attracted the attention of all intelligent students of our system of government. In assuming this high function our courts do not proceed on the theory that the judiciary is in any way superior to the two other co-ordinate departments, the executive and legislative, but solely because being required to declare the law of every case coming before them they must enforce the constitution as the paramount law whenever they find an enactment of the general assembly in conflict with it.    Such questions are always delicate and none are more so than when it is charged that the freedom of speech and of the press has been invaded by an act of the legislature.

Keeping in view then the relation of this court to

·the executive and legislative branches of our state gov-
ernment and the transcendent importance of preserving
the freedom of the press and of speech in a free country,
let us subject the act in question to this constitutional
test.

"The liberty of the press," says Lord MANSFIELD,
in *King v. Dean of St. Asaph*, cited in note to 3 T. R.
431, "consists in printing without any previous license,
subject to the consequence of law." Lord ELLENBOR-
OUGH defines it in *Rex v. Cobbett*, 29 Howell's State
Trials, 49, in this way: "The law of England is a law
of liberty, and, consistently with this liberty, we have
not what is called an *imprimatur*; there is no such pre-
liminary license necessary. But, if a man publish a
paper, he is exposed to the penal consequences, as he
is in every other act, if it be illegal."

Thus understood the provision in our bill of rights
was adopted substantially in the constitutions of several
states of our American union and in the federal consti-
tution. Says Judge COOLEY: "It must be evident from
these historical facts that liberty of the press, as now
understood and enjoyed, is of very recent origin; and
commentators seem to be agreed in the opinion that the
term itself means only that liberty of publication with-
out the previous permission of the government, which
was obtained by the abolition of the censorship."
Cooley on Constitutional Limitations [6 Ed.], p. 516;
Hallam's Const. History of England, ch. 15; DeLolme's
Const. of England, 254; 4 Blackstone's Com. 151;
Story on Const., sec. 1889; 2 Kent. 17, *et seq.*; Rawle,
Constitution, ch. 10.

The constitutional liberty of speech and of the
press, as we understand it, simply guarantees the right
to freely utter and publish whatever the citizen may
desire and to be protected in so doing, provided always
that such publications are not blasphemous, obscene,

and scandalous in their character so that they become an offense against the public, and by their malice and falsehood injuriously affect the character, reputation, or pecuniary interests of individuals. The constitutional protection shields no one from responsibility for abuse of this right. To hold that it did would be a cruel libel upon the bill of rights itself. The laws punishing criminal libel have never been deemed an infringement of this constitutional guaranty. Equally numerous and strong are the decisions that obscene publications are without the protection of this provision of our constitution.

In his singularly felicitous and forcible style Judge PHILIPS, in *U. S. v. Harmon*, 45 Fed. Rep. 414, sustained the constitutionality of a federal statute, section 3893, Revised Statutes U. S. (25. St., p. 496), prohibiting the depositing or sending of obscene publications through the postoffices of the United States. He says: "It may as well be said here as elsewhere that it is a radical misconception of the scope of the constitutional protection to indulge the belief that a person may print and publish, *ad libitum*, any matter, whatever the substance or language, without accountability to law. Liberty, in all its forms and assertions in this country, is regulated by law. It is not an unbridled license. Where vituperation or licentiousness begins, the liberty of the press ends. * * * While happily we have outlived the epoch of censors and licensors of the press, to whom the publisher must submit his matter in advance, responsibility yet attaches to him when he transcends the boundary line where he outrages the common sense of decency, or endangers the public safety. * * * In a government of law the law-making power must be recognized as the proper authority to define the boundary line between license and licentiousness, and it must likewise remain the

province of the jury—the constitutional triers of the fact—to determine when that boundary line has been crossed."

This view of the constitutionality of the federal law was affirmed on error by the circuit court of the United States in *Harman v. U. S.*, 50 Fed. Rep. 921, upon the authority of *Ex parte Jackson*, 96 U. S. 727, and *In re Rapier*, 143 U. S. 110. Similar statutes to this have been sustained in our sister states. *Com. v. Holmes*, 17 Mass. 336; *In Re Banks*, 56 Kan. (1895) 242; *Strohm v. People*, 160 Ill. 582. And this is the recognized practice in England, from whom we inherited our views of liberty to a large degree. *Regina v. Hicklin*, L. R. 3 Q. B. 360; *Queen v. Bradlaugh*, L. R. 2 Q. B. D. 569; *In Re Besant*, L. R. 11 Ch. D. 508.

The act, in our judgment, was clearly within the legitimate scope of legislation and in no sense obnoxious to the fourteenth section of the bill of rights of Missouri.

II. Conceding, however, that defendant was indicted for the transgression of a valid enactment, he could only be punished by the judgment of a legally constituted court. An essential in the formation of such a court is a duly qualified judge. Defendant now makes the objection that special Judge Woodson was not sworn. The record contains a written stipulation that Hon. A. M. Woodson, a member of the bar, possessed of all the qualifications of a circuit judge, should try said cause. It next recites that thereupon Mr. Woodson appeared to take upon himself the duties of special judge to try this cause and that "the oath of office as special judge is waived."

The objection is without merit, either in a court of conscience or law. It was ruled in *Grant v. Holmes*, 75 Mo. 109, that parties having waived the oath by a special judge could not afterward be heard to object

that he was not sworn.    It was held in *Tucker v. Allen*, 47 Mo. 488, that where parties agree that arbitrators may act without being sworn the award will be binding. To the same effect is *Vogt v. Butler*, 105 Mo. 479. Our statutes require an oath by arbitrators, referees, and special judges, and when this oath is waived it is uniformly held it will not vitiate the otherwise valid acts of these officials.

III. It is insisted, also, that the indictment is insufficient in that it fails to state the nature and cause of the accusation. In other words, it is contended that the defendant was entitled to be informed where the alleged newspaper is printed or purports to be printed; the date thereof; the edition of that date; to whom it was disseminated or sold; the names of the persons whose immoral conduct is published in said paper; the names of the men and women whose intrigues are set out; the identification of the scandals, whorings, lechery, and assignations published.

This court has aligned itself with those courts which require the indictment to contain allegations of all the facts necessary to support the charge. *State v. Terry*, 109 Mo. 601. Unquestionably this was essential at common law and is required by our bill of rights. This is the general rule, but there were exceptions to this rule at common law as well established as the rule itself,—notably in the cases of indictments for being a common scold or barrator; for keeping a disorderly or a common gambling house. But without generalizing it will be profitable to note just what particularity the courts have required in indictments for publishing or disseminating obscene papers, pictures, or books.

The first case in chronological order perhaps is *Com. v. Holmes*, 17 Mass. 336, decided in 1821. In that case the indictment charged that the defendant

knowingly, unlawfully, wickedly, maliciously, and scandalously did utter, publish, and deliver to A. B. a certain lewd, wicked, scandalous, infamous, and obscene printed book entitled "Memories of a woman of pleasure" which said printed book is so lewd, etc., that it would be "offensive to the court here, and improper to be placed upon the records thereof, etc..," without further averment of its contents. PARKER, C. J., said: "The second and fifth counts in this indictment are certainly good; for it can never be required that an obscene book and picture should be displayed upon the records of the court; which must be done if the description in these counts is insufficient."

In *People v. Girardin*, 1 Mich. 90, the indictment set forth among other things that the defendant did wickedly print and publish and cause to be printed and published a certain wicked, nasty, filthy, bawdy, and obscene paper and libel, entitled, "*City Argus*," in which said paper were contained divers wicked, false, feigned, impious, impure, and obscene matters, language, and discriptions. While recognizing the general rule in criminal charges the court held this sufficient, and cited *Com. v. Holmes* with approval.

In *Fuller v. People*, 92 Ill. 182, two counts in the indictment were held good which charged the defendant with unlawfully having in his possession a certain obscene and indecent picture, without setting out the particulars in which the obscenity consisted, and Justice SCHOLFIELD held the counts good, citing *McCutcheon v. People*, 69 Ill. 601; *Warriner v. People*, 74 Ill. 346.

In *State v. Brown*, 27 Vt. 619, Ch. J. REDFIELD held the indictment good, saying, "ordinarily the indictment * * * should set forth the book or publication *in haec verba* * * *. But * * *, in a case like the present, * * * if the paper is of a character to offend

decency, and outrage modesty, it need not be so spread upon the record * * *. And if it is alleged, in such case, to be a publication within the general terms in which the offence is defined, by the statute, it is sufficient which seems to be done in the present case." See also *State v. Pennington*, 5 Lea, 506; *State v. Smith*, 17 R. I. 371.

In *Bradlaugh v. Queen* (1878) L. R. 3 Q. B. D. 607, the foregoing American decisions were examined and discussed but were not followed, the appellate court overruling COCKBURN, C. J., and MELLOR, J., before whom the case was tried, *Queen v. Bradlaugh*, 2 Q. B. D. 569, and holding that it was necessary to set out the words of the obscene libel or book, *in haec verba.*

In *State v. Hayward*, 83 Mo. 299, section 1542, Revised Statutes, 1879, was construed, and it was held that it was not sufficient to simply follow the language of the statute. In that case neither the American nor English precedents had been followed.

The statute we now have before us for construction was evidently enacted to suppress a class of so-called newspapers which were mainly filled with obscene matter and salacious scandals thoroughly calculated to exercise a most corrupting and depraving influence not only upon the youth of the commonwealth but upon adults, save those of firm and stable minds. The object and design of the statute is most praiseworthy and commendable. The miserable excuse that the purpose of the publishers of these nasty blackmailing sheets was to reform the parties whose scandals and vices they portray was not credited by the legislature and to the most casual observer of the trend of such publications it is evident that they further and aggravate such offenses rather than deter the offenders.

Similar statutes have been enacted in our sister

states and vigorously upheld by their courts of last resort. Among others the legislature of Illinois in 1889 enacted a law to suppress selling, lending, giving away, or showing any minor child any paper or publication principally devoted to illustrating or describing immoral deeds. Under this act, by a rather singular coincidence, a party was indicted whose name *as defendant* in that case appears to be *the same ∘as the counsel who appears for the defendant in this case. Harry L. Strohn v. The People*, 160 Ill. 582, 60 Ill. App. 128.

In that case the indictment charged that on the sixteenth day of November, 1892, the defendant did unlawfully sell, give away, and show, etc., to one Burt Damon, who was then and there a minor child, a certain newspaper known as *"The Sunday Sun,"* purporting to be published in Chicago, which said newspaper was then and there devoted and principally made up of criminal news, police reports, and accounts of criminal deeds and stories of bloodshed, lust, and crime, contrary to the statute. Every objection here urged was there made to that indictment, but the supreme court of Illinois and the appellate court each held it sufficient. Said the supreme court: "It would be unreasonable, absurd, and impracticable to require that the entire matter contained in the newspaper should be stated at length in the indictment, and the setting out of a part, only, of the contents would not show that such newspaper was devoted to and principally made up of matter of the kinds mentioned in the act."

We have seen that even at common law it was sufficient to charge a party as a common scold, a common barrator or the keeper of a common bawdy house or a common gambling house without setting forth any particular acts of barratry or scolding. 1 Chitty, Crim. Law, *231. Keeping a bawdy house was punisha-

ble as a common nuisance not only in respect of its endangering the public peace by promoting quarrels among dissolute and debauched characters, but because it had a tendency to corrupt the manners of the people by an open profession of lewdness. 1 Jacobs' Law Dict., page 304. Upon identically the same principle was this statute enacted and doubtless such a paper would have been declared a common nuisance at common law. *Sidney's* case, Sid. 168; *Wilkes'* case, 4 Burr. 2530; 2 Archbold's Crim. Pr. & Pl., 1770.

How can it be said that defendant was not advised of the nature of the accusation against him? He is advised that on a day certain he sold a newspaper, a thing certain; of the name of "*The Kansas City Sunday Sun*," the specific name of the said newspaper, and purporting to be published in Kansas City, and that said paper was mainly devoted to the publication of scandals, whorings, lechery, etc. To require a more definite description would be to compel a copy of the whole paper to be set out which would be impracticable. Neither the organic nor statute law requires that to be done which is utterly unreasonable. "*Lex non cogit ad impossibilia*" is a maxim of the common law as appropriate to our day as in the days of Hobart.

The strict ruling in *Queen v. Bradlaugh, supra*, was soon remedied by an act of parliament. Act 43, Victoria No. 24; Act 15, Victoria No. 4; *Ex parte Collins*, 9 N. S. W. L. R. 497.

While it is not always sufficient to charge an offense in the language of the statute, yet when the words of the statute creating the offense plainly indicate the nature of the crime it is sufficient to charge the offense substantially in the words of the act. The act under consideration so plainly designates the criminal act to be the selling or disseminating an obscene news-

paper that we think when in addition to that it gives the name of the paper, the date thereof, and when sold, the sale or dissemination by defendant, and a general description of the contents of the paper itself, it is sufficient. Bishop on Crim. Proc., sec. 611, and cases in note 3.

Whether it is a prohibited paper must be determined by the jury under the instructions of the court, the test of obscenity being that which shocks the ordinary and common sense of men as an indecency. In this case moreover no possible harm could have resulted to defendant for want of a more definite description of the paper as he took the stand in his own behalf and testified that he bought and sold *The Kansas City Sunday Sun* because there was good profit in it. He purchased directly from the company which published it, and circulated about three thousand copies thereof every week at a profit of two and one half cents per paper; that he read the articles therein about people in St. Joseph. It was shown beyond a doubt that on the seventh day of March, 1896, the day alleged in the indictment, the defendant sold copies of *The Kansas City Sunday Sun* bearing date "Sunday, March 8, 1896;" the paper purchased of defendant on that date was offered and read in evidence. While it may have been better to allege the date in the indictment as a means of identifying the paper, no doubt could have arisen as to the paper he sold and for the dissemination of which he was indicted. We hold the indictment was sufficient after verdict. *Rosen v. U. S.*, 161 U. S. 29.

IV. As to the evidence some objections were made but in view of the overwhelming proof of the sale by defendant and of the scandalous and obscene character of the paper, no possible harm could have resulted from any of the questions asked and objected to.

V. Another material question is raised upon the record, and it relates to the competency of a juror, Harvey Campbell. On his *voir dire* he stated that he had an opinion that *The Kansas City Sunday Sun* ought to be suppressed but he had no opinion whatever as to the guilt or innocence of the defendant Van Wye. He had never read a copy of the said newspaper; his opinion was formed wholly from public talk. He could give an impartial verdict if selected as a juror and would not permit the opinion he had formed on rumor to bias him. He had never read a single article in the newspaper and only formed his opinion from what he understood was the general tone of the paper. The juror was clearly competent under the express provisions of our statute. R. S. 1889, sec. 4197.

VI. Finally the verdict is attacked on several gounds. There is no force in the point that a penitentiary sentence of two years is a cruel and unusual punishment within the meaning of the constitution. The offense of which defendant was convicted is far more dangerous to society than the stealing of $30 worth of goods to which a similar punishment is affixed. Neither is the objection good which assails the verdict because it did not find specifically on one of two counts. As both counts related to one and the same transaction a general verdict was sufficient. *State v. Pitts*, 58 Mo. 556; *State v. Noland*, 111 Mo. 473. The verdict is defective, however. It neglects to state the amount of punishment. It says the jury assessed "his punishment at two (2) in the penitentiary." They evidently intended two years. No point is made on this in the brief, but it is our duty to consider it as the verdict is a part of the record proper. Omitting the failure to assess the punishment did not vitiate the verdict. It was still a good general verdict of guilty and our statute requires the court to assess the

punishment when the jury fails to do so, and this the court did and assessed the punishment at the lowest penalty prescribed by the act.

Our conclusion is that there is no reversible error in the record and the judgment is affirmed. SHERWOOD and BURGESS, JJ., concur.