843 P.2d 839

**CITY OF FARMINGTON,**
**Plaintiff–Appellee,**

v.

**Tom FAWCETT, d/b/a Farmington**
**Magazine and Book Store,**
**Defendant–Appellant.**

**No. 12900.**

Court of Appeals of New Mexico.

June 30, 1992.

Certiorari Granted Aug. 14, 1992.

Certiorari Quashed Oct. 16, 1992.

Jay Burnham, Deputy City Atty., Farmington, James P. Mueller, Children's Legal Foundation, Phoenix, Ariz., for plaintiff-appellee.

Philip B. Davis, Jeffrey J. Buckels, Albuquerque, for defendant-appellant.

## OPINION

BLACK, Judge.

Defendant appeals his conviction of five counts of dissemination of obscene material in violation of Farmington, New Mexico, Ordinance Number 89–920, Section 21–50.1 (1989) (the Ordinance). He raises four issues on appeal: 1) whether the Farmington Ordinance violates Article II, Section 17 of the New Mexico Constitution, the free speech provision; 2) whether the trial court improperly admitted opinion evidence regarding community standards and improperly instructed the jury on those standards; 3) whether, as a matter of constitutional law, the magazines are patently offensive; and 4) whether there was sufficient evidence that the magazines lack serious literary, artistic, political, or scientific value. We remand for a new trial, based on the district court's improper jury instruction on the community standard.

### FACTS

Defendant operated the Farmington Magazine and Book Store. He sold a wide variety of magazines and books from this outlet, including the five magazines in controversy here: *The Best of Club, Forbid-den Erotica, Hot Swinging Couples, Over 40,* and *Swank.* The controversy between the City of Farmington (City) and Defendant arose when two City residents investigated Defendant's store for possible violations of the obscenity Ordinance. As a result of this investigation, a complaint was filed in municipal court, and Defendant and one of his employees were convicted of disseminating obscene materials.

Defendant appealed to the district court and received a trial de novo. Prior to trial, Defendant filed a motion to dismiss, alleging that the City Ordinance violated Article II, Section 17 of the New Mexico Constitution. The trial court denied the motion, apparently because it was not timely under the local rules. After hearing testimony and examining the magazines involved, the jury found Defendant guilty of five counts of dissemination of obscene materials.

## I. THE CONSTITUTIONALITY OF THE CITY ORDINANCE

The City argues that Defendant's failure to timely file his motion to dismiss precludes him from now arguing the issue of the unconstitutionality of the Ordinance. In a criminal prosecution the constitutionality of the statute (or ordinance) pursuant to which the defendant was convicted may be raised for the first time on appeal. *State v. Aranda,* 94 N.M. 784, 617 P.2d 173 (Ct. App.1980). Therefore, even though the motion to dismiss was not denied on its merits below, the constitutionality of the City's obscenity Ordinance may be argued on appeal. *See State v. Lujan,* 103 N.M. 667, 672–73, 712 P.2d 13, 18–19 (Ct.App. 1985), *cert. denied,* 103 N.M. 740, 713 P.2d 556 (1986).

The Farmington Ordinance at issue provides:

(a) No person shall:

(1) Knowingly sell, show or otherwise disseminate in any manner obscene material; or

(2) Knowingly possess obscene material with the intent to sell, show or otherwise disseminate the same.

(b) For the purposes of this section, "obscene material" shall be defined as material, written, pictorial or recorded, which: (1) Taken as a whole, appeals to the prurient interest in sex as judged by the average person applying local contemporary community standards; (2) Describes or depicts in a patently offensive way any of the following behavior designed or intended to stimulate sexual excitement: the description, depiction or simulated portrayal of the acts of sodomy, fellatio, cunnilingus, masturbation, excretory functions, ejaculation, sexual intercourse, bestiality, sadism or masochism; and (3) Taken as a whole, lacks serious literary, artistic, political or scientific value.

## A. *Standard of Review*

 In considering any constitutional challenge, we must establish the proper legal rules of construction. There is a presumption that all legislative acts, including municipal ordinances, are constitutional. *City of Albuquerque v. Jones*, 87 N.M. 486, 535 P.2d 1337 (1975). And it is the duty of the appellate court to uphold such legislation unless satisfied beyond all reasonable doubt that the legislation is outside the constitution. *State v. Ball*, 104 N.M. 176, 718 P.2d 686 (1986). The burden is therefore upon the party attacking the constitutionality of the enactment to show that the act is invalid. *Jones*, 87 N.M. at 488, 535 P.2d at 1339.

## B. *Prior Restraint*

Defendant initially argues that Article II, Section 17 of the New Mexico Constitution prohibits all prior restraints on speech and publication, and the City Ordinance constitutes such a prior restraint. That section of our constitution, which is pivotal to this appeal, provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

 We believe Defendant misconstrues the nature of "prior restraint." Pri-

or restraint means only that the government may not enjoin or restrain a particular expression prior to its judicial review, even though the same expression could constitutionally be subject to punishment afterwards. Laurence H. Tribe, *American Constitutional Law* § 12–34 (2d ed. 1988); Martin H. Redish, *The Proper Role of the Prior Restraint Doctrine In First Amendment Theory*, 70 Va.L.Rev. 53 (1984); *see also Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115 (1st Cir.1981). A municipal anti-obscenity ordinance does not constitute a prior restraint on speech when the municipality has the burden of instituting prompt judicial proceedings and there is no provision for restraint prior to such judicial review. *Eastern Books v. Bagnoni*, 446 F.Supp. 643 (W.D.Pa.1978); *cf. State v. Jackson*, 224 Or. 337, 356 P.2d 495 (1960) (statute making it a crime to prepare, publish, sell, distribute, or give away any obscene or indecent matter is not a prior restraint).

## C. *Free Speech is not Absolute*

██ Defendant next urges us to "hold that there is no exception, whether for obscenity or otherwise, to the absolute right of free publication stated in the first clause of Article II, Section 17." One need only consider this proposition logically to realize it cannot stand. No civilization can survive which allows its press to freely publish troop movements in times of war, or permits its citizens to falsely yell "Fire!" in a crowded theater. Even in a society which cherishes free speech above other personal liberties, life presents situations where such civil liberties must be balanced. *See Blount v. TD Publishing Corp.*, 77 N.M. 384, 388, 423 P.2d 421, 424 (1966).

While the language of Article II, Section 17, unambiguously protects speech on *all* subjects, our supreme court has recognized that the state may constitutionally regulate the place and manner of such speech. *Nall v. Baca*, 95 N.M. 783, 626 P.2d 1280 (1980) (nude dancing may be restricted in liquor establishments); *Stuckey's Stores, Inc. v. O'Cheskey*, 93 N.M. 312, 600 P.2d 258 (1979) (commercial billboard "speech" may

be regulated), *appeal dismissed*, 446 U.S. 930, 100 S.Ct. 2145, 64 L.Ed.2d 783 (1980). The supreme court has also recognized that the constitutional liberty to speak freely can be limited to the extent it conflicts with other constitutionally protected rights. *State ex rel. New Mexico Press Ass'n v. Kaufman*, 98 N.M. 261, 648 P.2d 300 (1982) (media's right to free speech may be limited when necessary to guarantee defendant a fair trial).

Moreover, Defendant emphasizes the initial language of Article II, Section 17, and ignores the clear limitation also contained in that section. After granting citizens the right to speak freely, our constitution makes each person "responsible for the abuse of that right." A citizen who "abuses" the right of free speech may be legally liable. *See Blount*, 77 N.M. at 388, 423 P.2d at 424. Can obscenity be an "abuse" of free speech? We believe it can.

■ Dicta in various New Mexico cases appear to acknowledge that obscenity may be an abuse of the right to "freely speak, write and publish." In *Curry v. Journal Publishing Co.*, the supreme court said:

The First Amendment to the Constitution of the United States provides that Congress shall make no law abridging the freedom of speech or of the press; the effect of which was to prevent Congress from interfering with such rights as they existed at the time of the adoption of this amendment. Similar provisions are a part of the constitution of each of the forty-eight states. See section 17 of article 2 of the New Mexico Constitution.

"The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing, except so far as such publications, from their blasphemy, *obscenity*, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals."

41 N.M. 318, 328, 68 P.2d 168, 174–75 (1937) (emphasis added) (quoting 2 Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 886 (8th ed. 1927)).

Much more recently in *State v. Gattis*, 105 N.M. 194, 730 P.2d 497 (Ct.App.1986), this court upheld a statute proscribing malicious use of the telephone against a challenge based on the First Amendment of the United States Constitution. In doing so, we quoted from *von Lusch v. State*, 39 Md.App. 517, 387 A.2d 306, 310 (1978). " 'Freedom of speech does not encompass the right to abuse the telephone with the specific intent to annoy and to harass the recipient of the call.' " 105 N.M. at 199, 730 P.2d at 502.

The language of Article II, Section 17, therefore, recognizes that obscenity may be an abuse of free speech. Other jurisdictions have reached the same conclusion when interpreting substantially similar constitutional provisions.

Although the language guaranteeing free speech in Article II, Section 17 of the New Mexico Constitution differs somewhat from the First Amendment of the United States Constitution, it is virtually identical to the language adopted by thirty-nine other states which also make citizens responsible for the "abuse" of the right.[1] Some

---

1. The following table from the *Index Digest of State Constitutions* 485 (Richard A. Edwards ed., 2d ed. 1959) indicates the precise linguistic formulations of the "abuse" standard:

Every person may speak on all subjects, being responsible for abuse of that liberty. Ala I 4; Colo II 10; Ga I Sec I 15; Iowa I 7; La I 3; Tex I 8.

Same; inserts "freely" before "speak". Alas I 5; Ariz II 6; Fla DR 13; Ida I 9; Ill II 4; Kan BR 11; Ky 8; Me I 4; Mich II 4; Minn I 3; Mont III 10; Nebr I 5; NJ I 6; NM II 17; ND I 9; Okla II 22; SD VI 5; Wash I 5; Wis I 3; Wyo I 20.

Every citizen may freely speak on all subjects, being responsible for abuse of that right. Cal I 9; Conn I 5; Nev I 9; NY I 8; Ohio I 11; Pa I 7; Tenn I 19; Va I 12.

Citizens of state ought to be allowed to speak on all subjects, being responsible for abuse of that privilege. Md DR 40.

Every person to be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for abuse of that liberty. Mo I 8.

state courts have followed the United States Supreme Court's interpretation of the First Amendment, *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and found that por-nography or obscenity is not entitled to protection under such language;[2] others have found that all speech is protected, but obscenity may be an "abuse" of the right.[3] Our conclusion that obscenity constitutes an abuse of the right to freely speak and publish is, then, both plain in the language of Article II, Section 17, and supported by the interpretation given similar provisions by several other state courts.

We also find little of relevance in the "historical facts" offered by Defendant, who relies heavily on *State v. Henry*, 302 Or. 510, 732 P.2d 9 (1987), for his interpretation of history. In *Henry* the Oregon Supreme Court traced the history of obscenity regulation in England and its American colonies in the seventeenth and eighteenth centuries. That court relied on Oregon's limited criminalization of distributing obscenity only to minors in the nineteenth century, and concluded that obscenity—unlike perjury, solicitation of crime, and fraud—did not fall within any recognized exception to free speech at the time Oregon's Bill of Rights was adopted in 1857.

The Colorado Supreme Court participated in the same process and reached the opposite conclusion in *People v. Ford*, 773 P.2d 1059 (Colo.1989) (en banc). That court expressly rejected the historical analysis set forth in *Henry*, saying:

> We also decline to adopt the historical analysis in *State v. Henry*, 302 Or. 510, 732 P.2d 9 (1987), because the Oregon court concentrated on the state of the law in the early 19th century rather than at the time our constitution was adopted in 1876. We believe that the status of obscenity regulation across the nation in the early 1870's is more relevant in assessing whether the framers of our constitution intended to protect obscenity.

773 P.2d at 1065. The Colorado court noted that not only was the Colorado Constitution adopted twenty years after Oregon's, but that Colorado had statutes prohibiting the dissemination of obscenity both before and immediately after the adoption of its constitution in 1876. *Id.; see also Long v. 130 Mkt. St. Gift & Novelty*, 294 Pa.Super. 383, 440 A.2d 517 (1982) (concluding the "abuse" language was adopted because the First Amendment was thought to be absolute at the time the Pennsylvania Constitution was adopted).

A similar historical analysis of Article II, Section 17 of the New Mexico Constitution produces no definitive answer, but provides no solace for Defendant. The 1846 Kearny frame of government consisted of a code of laws, including a bill of rights, promulgated by Brigadier General Kearny after his occupation of Santa Fe during the Mexican War. *Leyes del Territorio de Nuevo Mejico*, introduction (1846). The twelfth article of the bill of rights provided: "That free communications of thoughts and opinions is one of the invaluable rights of freemen, and that every person may freely speak, write or print on any subject—being re-

---

Restrictions on Legislation
No law to restrict right to speak freely on any subject; but for abuse of that right every person to be responsible. Ind I 9; Ore I 8. The Utah Constitution also adopts a responsibility for abuse standard in the following terms: "All men have the inherent and inalienable right ... to communicate freely their thoughts and opinions, being responsible for the abuse of that right." Utah Const. art. I, § 1. The Delaware Constitution provides in relevant part: "The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty." Del. Const. art. I, § 5.

2. *See, e.g., Fordyce v. State*, 569 N.E.2d 357 (Ind. Ct.App.1991); *State v. Simmer*, 772 S.W.2d 372 (Mo.1989) (en banc); *City of Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 539 N.E.2d 140 (1989); *West Gallery Corp. v. Salt Lake City Bd. of Comm'rs*, 586 P.2d 429 (Utah 1978); *Fine Arts Guild, Inc. v. City of Seattle*, 74 Wash.2d 503, 445 P.2d 602 (1968) (en banc).

3. *People v. Ford*, 773 P.2d 1059 (Colo.1989) (en banc); *Long v. 130 Mkt. St. Gift & Novelty*, 294 Pa.Super. 383, 440 A.2d 517 (1982); *K. Gordon Murray Prods., Inc. v. Floyd*, 217 Ga. 784, 125 S.E.2d 207 (1962); *People v. Neumayer*, 405 Mich. 341, 275 N.W.2d 230 (1979); *cf. State v. Davidson*, 481 N.W.2d 51 (Minn.1992) (obscenity a per se abuse).

sponsible for every abuse of that liberty." *Id.* at 15.

New Mexico's initial move toward statehood began immediately after execution in 1848 of the Treaty of Guadalupe Hidalgo. *Constitution of the State of New Mexico, 1850* vii-viii (Stagecoach Press 1965). Even though New Mexico, including what is now Arizona, was not yet an organized territory, a "state" constitution was drafted and adopted. *Id.* As early as 1850, the proposed New Mexico Constitution copied the free speech clause already widely adopted in other states: "Every person may freely speak, write and publish, his sentiments on all subjects, being responsible for the abuse of that liberty." *Id.* at 15 (N.M. Proposed Const. of 1850, art. I, § 5). Further attempts at statehood produced constitutions containing guarantees of free speech, but always making citizens responsible for its abuse. *See* N.M. Proposed Const. of 1872, art. II, § 4; N.M. Proposed Const. of 1889, art. II, § 16.

After being rebuffed in its first attempt at statehood, New Mexico organized its territorial government under the Organic Act in 1851. L. Bradford Prince, *New Mexico's Struggle for Statehood* 22-23 (1910). In 1873 the United States Congress passed an act applicable to all its territories, including New Mexico, which provided in part:

> [W]hoever ... shall sell, or lend, or give away, or in any manner exhibit, or shall otherwise publish or offer to publish in any manner, or shall have in his possession, for any such purpose or purposes, any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article of an immoral nature ... shall be imprisoned at hard labor ... or fined....

An Act for the Suppression of Trade in, and Circulation of, Obscene Literature and Articles of Immoral Use, ch. 258, 17 Stat. 598 (1873).

In November 1910, the New Mexico Constitutional Convention adopted the state constitution containing the language of Article II, Section 17. Dorothy I. Cline, *New Mexico's 1910 Constitution* (1985). What, then, did the framers of Article II, Section 17 of the New Mexico Constitution intend by making every person responsible for the "abuse" of free speech? It seems likely they understood there was nothing inherently contradictory in adopting this constitutional standard at a time when the distribution of obscene materials had long been prohibited in the territory.

Moreover, since almost one-third of the constitutional delegates were lawyers who received their legal training in other states, they may have brought some understanding on the subject from their states of origin. *Id.* at 30. Two of the primary drafters, Thomas B. Catron and Charles A. Spiess, for example, were born and educated in Missouri. *Id.* at 31–35. In spite of constitutional language similar to that adopted by the 1910 New Mexico convention, Missouri had long recognized the state could prohibit obscenity. *State v. Van Wye*, 136 Mo. 227, 37 S.W. 938 (1896); *State v. Appling*, 25 Mo. 315 (1857). Another prominent convention leader, Charles Springer, had come from Iowa to practice law near Cimarron. Cline, *supra*, at 35. Iowa, too, had constitutional language virtually identical to that adopted by the New Mexico delegates, but also had recognized the power of the state to criminalize the distribution of obscenity. Iowa Rev.Laws, part IV, tit. 23, ch. 172, § 4359 (1860) (as cited in *Ford*, 773 P.2d at 1065 n. 7); *State v. Doty*, 103 Iowa 699, 73 N.W. 352 (1897).

Even if we found the language of Article II, Section 17, ambiguous and resorted to the historical setting as urged by Defendant, we could not accept his conclusion that the framers of the 1910 constitution intended no liability for obscenity as an abuse of free speech. Moreover, as the Colorado Supreme Court stated in *Ford*, the history of obscenity regulation in the years immediately preceding the adoption of our constitution is more relevant than the early English law and English colonial law which were the foundation for the Oregon court in *Henry*. While evidence of the

**544**

historical context of our 1910 constitution is not conclusive, it augurs in favor of finding that the language of Article II, Section 17, was not intended to preclude the regulation of obscenity as an abuse of free speech.

 If the language of the constitution is plain, definite, and free from ambiguity, the intent is to be found in the instrument itself and it is not necessary to resort to such extrinsic aids as the conditions of its adoption. *Flaska v. State,* 51 N.M. 13, 177 P.2d 174 (1946); *State ex rel. Delgado v. Romero,* 17 N.M. 81, 124 P. 649 (1912). The drafters of the constitution are presumed to give the words their plain, natural, and usual significance. *Wylie Bros. Contracting Co. v. Albuquerque–Bernalillo County Air Quality Control Bd.,* 80 N.M. 633, 459 P.2d 159 (Ct.App. 1969). We believe the term "abuse" clearly qualifies the constitutional right to free speech and press in New Mexico. Even if we did not find the language clear, however, the extrinsic aids offered by Defendant do not convince us the City Ordinance runs afoul of Article II, Section 17.

## II. WHAT CONSTITUTES AN "ABUSE" OF FREE SPEECH AND PRESS UNDER ARTICLE II, SECTION 17?

### A. *Jury Instructions*

That "obscenity" may be an "abuse" of free speech and press is, then, clear. What type of material constitutes such an abuse is less clear. The Farmington ordinance tracks the definition of obscenity approved by the United States Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Defendant urges us to interpret Article II, Section 17 of the New Mexico Constitution so as to reject the definition of obscenity set forth in *Miller.* We note initially that, while we relied upon the definition of obscenity set forth in *Miller* and other United States Supreme Court cases to affirm a conviction

for distribution of obscene material in *State v. Johnson,* 104 N.M. 430, 722 P.2d 681 (Ct.App.), *cert. denied,* 104 N.M. 378, 721 P.2d 1309 (1986), the defendant in *Johnson* did not contend that the Curry County ordinance under which he was convicted violated Article II, Section 17 of the New Mexico Constitution. *Johnson* therefore offers no direct guidance on this issue.

The *Miller* definition of obscenity has also been cited with approval by the New Mexico Attorney General's office in opining on the authority of the State to proscribe the possession of child pornography. AG Op. No. 90–24 (1990). And while by no means identical, our legislature adopted criteria somewhat similar to those in *Miller* in prohibiting the sexual exploitation of children. *See* NMSA 1978, § 30–6A–2 (Repl.Pamp.1984). Again, however, this offers little guidance on whether Article II, Section 17 of the New Mexico Constitution mandates a different legal analysis under the City Ordinance.

 Defendant argues that the free expression provision of the New Mexico Constitution provides greater protection than the First Amendment to the United States Constitution. While the difference in the language used in the First Amendment and Article II, Section 17, may be some evidence that the drafters of the New Mexico Constitution intended a somewhat different scope of protection,[4] our supreme court has recognized that Article II, Section 17, "reads substantially the same" as the First Amendment. *Nall v. Baca,* 95 N.M. 783, 787, 626 P.2d 1280, 1284 (1980) (dictum); *see also Curry,* 41 N.M. at 328, 68 P.2d at 174–75 (Article II, Section 17, characterized as "similar" to the First Amendment). Even where the language of our state constitution is almost identical to the federal constitution, however, federal decisions do not control the nature and scope of the rights guaranteed by the New Mexico Constitution. *State v. Cordova,* 109 N.M. 211, 784 P.2d 30 (1989). While it

---

4. *Cf. State v. Sutton,* 112 N.M. 449, 455, 816 P.2d 518, 524 (Ct.App.) (dictum) (difference in language in the state constitutional provision regarding search and seizure "is some evidence

that the state constitutional provision may be interpreted to provide broader protection than the federal"), *cert. denied,* 112 N.M. 308, 815 P.2d 161 (1991).

is settled constitutional law that state courts may not restrict the protection afforded by the federal Constitution, as interpreted by the United States Supreme Court, they may find greater protection under their state constitutions, even when the language is identical. *McCauley v. Tropic of Cancer*, 20 Wis.2d 134, 121 N.W.2d 545 (1963); William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U.L.Rev. 535, 548 (1986).

■ Defendant argues that the "contemporary community standard" provided by *Miller*, and adopted in the City Ordinance, allows the majority to impose its moral standards on the minority. He notes, correctly we believe, that the purpose of such constitutional protections is to prevent the majority from limiting the personal liberties of political, religious, and cultural dissenters while propagating their views in the marketplace of ideas. *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185–86, 87 L.Ed. 1628 (1943); *Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 697, 763 P.2d 1153, 1162 (1988). Defendant, however, does not offer a formula he believes less "oppressive" than *Miller*[5] or any state precedent interpreting similar constitutional provisions. Rather, he contends for absolute freedom of expression. As we have indicated, we find little legal support for such an interpretation and have declined to adopt it.

We can, however, assume that the authors of the New Mexico Constitution were aware of the language of the First Amendment to the United States Constitution and consciously chose to adopt a different formula. We must therefore determine the legal significance of such a choice.

In considering language different from the First Amendment but similar to Article II, Section 17, other state courts have adopted various interpretations. A majority of the Maine Supreme Court opted to follow the United States Supreme Court and hold obscenity is not protected under the "abuse" language of their state constitution. *City of Portland v. Jacobsky*, 496 A.2d 646 (Me.1985). However, in a thoughtful partial concurrence, Justice Scolnik pointed out that the "abuse" standard of the Maine Constitution sets different parameters than the language of the First Amendment:

Unlike the First Amendment ("Congress shall make no law ... abridging the freedom of speech, or of the press ..."), Article I, Section 4 [of the Maine Constitution] is an affirmative grant of liberty to the citizen: "[e]very citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty."

Looking first at the plain meaning of this clause, one finds that it has not been overlaid by judicial interpretation as has the federal First Amendment. On its face, Article I, Section 4 does not merely vouchsafe protection to the expression of ideas of value, but to "sentiments on any subject." The word "sentiments," comporting elements of emotion and feeling, may, by itself, be broader than "ideas." More important, *no subject is unprotected.* The Maine Constitution extends at least the protection of constitutional-level scrutiny to the expression of sentiments on any subject, whether it be hostile and vulgar as in *State v. John W.*, [418 A.2d 1097 (Me.1980) ] or sexually explicit, as in the present case. None should be deemed wholly without protection and, by the plain language of Article I, Sec-

---

**5.** Providing a legal definition of obscenity has proved a monumental task. *Pornography, Obscenity & the Law* 2–6 (Lester A. Sobel ed., 1979); Cynthia L. Estlund, *Speech on Matters of Public Concern: The Perils of an Emerging First Amendment Category*, 59 Geo.Wash.L.Rev. 1, 42–43 (1990). Indeed, the late Justice Harlan pronounced this problem "intractable" as early as 1968. *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 704, 88 S.Ct. 1298, 1313, 20 L.Ed.2d 225 (1968) (Harlan, J., concurring and dissenting). This problem is perhaps best illustrated by federal decisions holding that, while "obscenity" is not entitled to protection, "indecency" is protected by the First Amendment. *FCC v. Pacifica Found.*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Action for Children's Television v. FCC*, 932 F.2d 1504 (D.C.Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1281, 117 L.Ed.2d 507 (1992).

tion 4, that protection only recedes so far as to permit holding the citizen "responsible for the abuse of this liberty." [Footnotes omitted.]

496 A.2d at 653.

The issue, then, is what standard the finder of fact, either judge or jury, should use to determine whether an "abuse" has occurred. In this regard, we are impressed with Defendant's argument that the district court erred in giving the jury the following instructions:

Contemporary community standards are determined by what the community as a whole in fact finds acceptable. The community as a whole is society at large, and not particular people or particular groups. What some people think the community ought or ought not to accept is not important nor is what you as an individual juror think is good or bad. It is what people in general, the community as a whole, accept that is determinative. You should judge how the average person in this community would view this material.

For this case, the "community" is the City of Farmington, N.M.

"Patently offensive" means that which offends or affronts local contemporary community standards because it goes beyond the customary limits of candor and decency in describing or representing sexual matters. Contemporary community standards are set by what is in fact accepted in the community as a whole.

While there is some question, it seems likely that these instructions would pass constitutional muster under the First Amendment. Defendant, however, argues that Article II, Section 17 of the New Mexico Constitution offers more protection than the First Amendment. We are inclined to agree that our constitution requires a standard somewhat broader than "decency" and "accepted in the community as a whole."

When we consider the jury instructions given in this case, we believe they allowed the jury to convict Defendant for speech which was merely "unacceptable" or beyond "decency." The purpose of free speech and press is to preserve "the independence of public discourse so that a democratic will within a culturally heterogeneous state can emerge under conditions of neutrality, and so that individuals can use the medium of public discourse to persuade others to experiment in new forms of community life." Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and Hustler Magazine v. Falwell,* 103 Harv.L.Rev. 601, 684 (1990). Freedoms of expression require "breathing space." *New York Times Co. v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). "Acceptance" is really the lowest common denominator, and may well limit dialogue on significant public issues beyond obscenity. Tribe, *supra,* § 12–16, at 913. "Decency" implies what is "proper." *Ford,* 773 P.2d at 1066. The community, or indeed the average person, may well find some speech "unacceptable" or not "decent" which is nonetheless constitutionally permissible. Professor Schauer recognized this distinction, saying:

In most obscenity cases, the materials would in fact offend most people. But there is another possible interpretation, that asks not whether the materials offend the community or the average person, but whether the community or the average person is offended by the materials being available to those who wish to see them. In other words, are the community standards tolerant, even though most members of the community might themselves be offended by the materials.

Frederick F. Schauer, *The Law of Obscenity* 133 (1976).

▬▬▬ Rather than allowing the fact finder to determine that material is an abuse of the grant of free speech under Article II, Section 17, based on the "acceptance" of the community, we believe more is required. We believe our constitution requires that, although the community might not find the materials "acceptable," it must find them "intolerable" before they may be deemed as an "abuse" of the right to freely speak, write, and publish sentiments on all subjects.

In reaching this conclusion, we are persuaded by a case heavily relied upon by the City for other theories, *People v. Ford,* 773 P.2d 1059 (Colo.1989) (en banc). In *Ford* the Colorado Supreme Court determined that obscenity could be an abuse of the right to freely speak under the Colorado Constitution, but held that an "abuse" could only be defined in terms of speech that was intolerable and not merely unacceptable. *Id.* at 1066–67. In requiring a new trial because the jury had been instructed on a community standard based on "acceptance," the Colorado court reasoned:

We also believe that the "tolerance" standard is acceptable under the Colorado Constitution. We have previously stated, and reaffirm today, that our constitution extends broader protection to freedom of expression than does the first amendment to the United States Constitution. *See People v. Seven Thirty–Five East Colfax, Inc.,* 697 P.2d 348 (Colo. 1985). In order to be constitutionally sufficient, the definition of "patently offensive" must incorporate a standard which protects all but the most insufferable of sexually explicit material. Although both federal and state courts have approved definitions of "patently offensive" which incorporate community standards of decency, acceptance, or tolerance, we believe that the tolerance standard better protects freedom of expression, and is the only standard of the three which would satisfy the Colorado Constitution. Whereas "decency" implies a community standard of what is proper, and "acceptance" connotes approval, tolerance stretches the community's standards to their outermost limits. When a tolerance standard is employed, material is not offensive unless the community cannot endure it.

773 P.2d at 1066. The "tolerance" standard has also been advanced by legal scholars and adopted in other jurisdictions as the proper measure when "abuse" is constitutionally mandated. *State ex rel. Collins*

*v. Superior Court,* 163 Ariz. 246, 787 P.2d 1042 (1986) (en banc) (interpreting First Amendment); *Leech v. American Booksellers Ass'n,* 582 S.W.2d 738 (Tenn.1979); Michael K. Curtis, *Obscenity: The Justices' (Not So) New Robes,* 8 Campbell L.Rev. 387, 410 (1986); *cf. State v. Davidson,* 481 N.W.2d 51 (Minn.1992) (although tolerance might better reflect the appropriate considerations in obscenity cases, instruction based on "acceptance" permissible).

We likewise believe that "the tolerance standard better protects freedom of expression," *Ford,* 773 P.2d at 1066, and is the only standard which can truly satisfy Article II, Section 17 of the New Mexico Constitution. Since defining community standards to require the speech or publication at issue be beyond community tolerance also has received approval under the First Amendment,[6] only one jury instruction defining community standards should be necessary.

### B. *Non–Expert Testimony on Community Standards*

Defendant next argues that the trial court abused its discretion in allowing James Bacon and Keith Baker to testify that they felt the five magazines violated the community standard. Since this case is remanded for a new trial, we will briefly consider this issue.

Baker gave his opinion on community standards. He testified that he was acquainted with the twenty or so employees he supervises at a Farmington-area oil company, sees people at his church and his "spa," and has children involved in "lots of activities." Like Bacon, he basically testified that, in his opinion, the magazines at issue appealed to a prurient interest in sex as judged by an average person applying the community standards of Farmington.

■■■ Defendant argues that Baker and Bacon were not properly qualified to testify as experts on the community standard; however, there is nothing in the rec-

---

**6.** *Smith v. United States,* 431 U.S. 291, 305, 97 S.Ct. 1756, 1766, 52 L.Ed.2d 324 (1977); *United States v. Various Articles of Obscene Merchandise,* 709 F.2d 132, 136–37 (2d Cir.1983); *Red*

*Bluff Drive–In, Inc. v. Vance,* 648 F.2d 1020, 1028–29 (5th Cir.1981), *cert. denied,* 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982).

ord to show that they were offered as expert witnesses. A review of their testimony shows that they were simply giving their own opinions based on their own observations. This is valid lay testimony. The only foundation required for this kind of testimony is a showing of first-hand knowledge and a rational connection between the observations made and the opinion formed. *State v. Luna*, 92 N.M. 680, 594 P.2d 340 (Ct.App.1979).

■■■■ Defendant further argues that, even as lay opinion, Baker's and Bacon's testimony should not have been admitted. Where the magazines were actually presented to the jury, which presumably represents a random cross-section of the community and can judge what the community will tolerate, no further testimony, especially of a non-expert nature, is necessary. *Olsen v. Doerfler*, 14 Mich.App. 428, 165 N.W.2d 648 (1968); Schauer, *supra*, at 135. However, the fact that the testimony is not strictly necessary does not mean that a court abuses its discretion when it is admitted. *See State v. Worley*, 100 N.M. 720, 676 P.2d 247 (1984) (admission of evidence is discretionary with trial court).

### III. STANDARD OF APPELLATE REVIEW

■■■■ Defendant urges us to determine "as a matter of constitutional fact, the magazines are not patently offensive." The proper role of the appellate court in obscenity cases is one which has engendered a variety of opinions. E.H. Schopler, Annotation, *Modern Concept of Obscenity*, 5 A.L.R.3d 1158, § 15(b) (1966 & Supp. 1991); *see also* Comment, *Removal of Supreme Court Appellate Jurisdiction: A Weapon Against Obscenity?*, 1969 Duke L.J. 291. Many courts have held that the appellate court is obligated to make an independent, de novo review of all the evidence. *See, e.g., State v. LeWitt*, 3 Conn.

Cir. 605, 222 A.2d 579 (1966); *Dyke v. State*, 232 Ga. 817, 209 S.E.2d 166 (1974), *cert. denied*, 421 U.S. 952, 95 S.Ct. 1687, 44 L.Ed.2d 106 (1975); *People v. Anderson*, 130 Ill.App.3d 318, 85 Ill.Dec. 540, 473 N.E.2d 1345 (1985), *aff'd*, 112 Ill.2d 39, 96 Ill.Dec. 58, 490 N.E.2d 1263 (1986). Other jurisdictions review the record only for substantial evidence. *United States v. Cutting*, 538 F.2d 835 (9th Cir.1976), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977); *Nissinoff v. Harper*, 212 So.2d 666 (Fla.Dist.Ct.App.1968); *Court v. State*, 63 Wis.2d 570, 217 N.W.2d 676 (1974). We are inclined to follow the second line of precedent, for as Professor Schauer notes, "If the appellate court were not in any way influenced by the rulings or verdict below, then there would be no purpose in having trials at all in obscenity cases." Schauer, *supra*, at 152.

■■■■ We also believe our approval of the *Miller* test with the community standard based on tolerance influences the level of appellate review.[7] Under *Miller*, which is also the model for this City Ordinance, we believe the first two prongs of the three-prong test are primarily factual issues to be judged by contemporary community standards. *Miller*, 413 U.S. at 24–26, 93 S.Ct. at 2615–16; *State v. Anderson*, 322 N.C. 22, 366 S.E.2d 459, *cert. denied*, 488 U.S. 975, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988). Obviously, the judge or jurors who live in the community are better able to determine what the community can tolerate. The "patently offensive" test is also measured by community tolerance and, because of the constitutional aspects of the decision, the scope of review must be broader than for a conventional factual determination; however, deference to the jury findings is again due. Schauer, *supra*, at 114; *see also Smith v. United*

---

7. The *Miller* test requires the trier of fact to determine "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the [ordinance]; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2615 (citation omitted) (quoting *Roth v. United States*, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1956)).

*States,* 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977).

■ On the third prong (i.e., whether the work has serious literary, artistic, political, or scientific value) the appellate court will possess at least equal expertise and authority. The "value" of a work is not to be judged by community standards. *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). "The value of a work, unlike its prurient appeal or patent offensiveness ... does not vary from community to community based on the degree of local acceptance it has won." 3 Ronald D. Rotunda et al., *Treatise on Constitutional Law* § 20.61, at 102 (1986 & Supp.1991).

Although somewhat dated, Professor Schauer's treatise summarizes the appropriate appellate role in this process succinctly:

> In other words, the appellate court must make an independent review, but the question to be asked is not whether the materials are obscene, but whether the materials create a jury issue as to obscenity. Since this involves questions of constitutional law, more evidence is needed to create a jury issue than in other criminal cases, not by virtue of a different standard, but by virtue of the various elements of the *Roth–Miller* test.

Schauer, *supra,* at 152.

We have independently reviewed the evidence under these standards. We believe there was sufficient evidence to submit this case to the jury on the first two prongs of *Miller.* Defendant does not seriously argue, nor did our independent examination discover, that the magazines have any serious literary, artistic, political, or scientific value. We therefore decline Defendant's invitation to hold that "as a matter of constitutional fact, the magazines are not patently offensive."

## IV. SUBSTANTIAL EVIDENCE ON LACK OF VALUE

■ Finally, Defendant argues, because "the city failed to present substantial evidence that the magazines as a whole lacked serious literary, artistic, political or scientific value," the convictions must be reversed. As indicated earlier, "Once the allegedly obscene material is actually placed into evidence the state need not present expert testimony that the material is obscene, lacks serious artistic value, or any other ancillary evidence of obscenity." Rotunda et al., *supra,* § 20.61(g).

## CONCLUSION

Based on our conclusion that Article II, Section 17 of the New Mexico Constitution requires that an "abuse" of free speech only occurs when the community cannot tolerate the matter on trial, we hold that a new trial is required and the jury must be so instructed.

IT IS SO ORDERED.

CHAVEZ and PICKARD, JJ., concur.